(No. 23407.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MICHAEL COZZI, Plaintiff in Error.

*Opinion filed June 10, 1936.*

LIBONATI, MUNIZZO & CEFFALIO, (ROLAND V. LIBONATI, of counsel,) for plaintiff in error.

. OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, and RICHARD H. DEVINE, of counsel,) for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Michael Cozzi was convicted in the criminal court of Cook county of the murder of Attilio DiSimone and sentenced to the penitentiary for a term of ninety-nine years. The jury in a previous trial disagreed. The cause is here on writ of error.

The deceased operated a confectionery and lunch room on the first floor of 1104 West Taylor street, in the city of Chicago, and lived with his wife and four children on the second floor of the premises. About 8:00 o'clock on the night of January 11, 1933, while in front of his store, he was shot. Mrs. DiSimone testified that she was upstairs; that she heard three shots, and on looking out of the window saw somebody lying on the sidewalk; that she went down-stairs, and upon finding it was her husband ran back and called the police. Police officers responding to the call found DiSimone still alive and took him to a hospital, where he died the next day. Three bullets were found in the body. One of them entered near the top of the head, toward the back. The second entered near the midline of the back, about two inches to the right of the spine. The

third entered about two inches to the back of the right hip bone. After DiSimone was sent to the hospital some of the officers went to the soft drink parlor of Anthony Gallicchio, located a short distance away, where they saw defendant. They arrested him, and found in the flush-box of the toilet in the rear of the room a revolver containing three loaded cartridges and three that had been discharged. Defendant was taken by the police to the hospital. In his presence DiSimone was asked if the man who shot him was in the room. He said that Cozzi shot him, and gave as his reason that Cozzi had been intimate with Mrs. DiSimone, applying an obscene expression to Cozzi. Shortly thereafter DiSimone signed by mark an alleged dying declaration that Cozzi shot him. On objection to its admission in evidence it was excluded.

Defendant was represented by the public defender. Different counsel appear for him here. He urges that he did not have a fair, impartial trial; that the jury was inflamed by incompetent, prejudicial testimony and intemperate argument of the State's attorney, that the verdict is against the manifest weight of the evidence, and there is a reasonable doubt of his guilt.

We first consider the claim that testimony was improperly admitted. Police officers John J. Seery, Maurice O'Keefe, Anthony Trifone, Joseph Pieroth, Walter R. Grish and William N. Carney, Dr. Carl Champagne, and Alvina Nels, a nurse at the hospital, testified defendant made no reply to DiSimone's accusation but remained silent. Five of them testified he merely shrugged his shoulders. Carney testified that in addition he sneered. Dr. Champagne testified that when DiSimone accused defendant of the shooting he heard somebody say, "You are crazy;" that it sounded like Cozzi's voice coming from the foot of the bed, but he could not say whether or not it was Cozzi who made the statement. Defendant testified that DiSimone could not see when he was interrogated; that he was prac-

tically blind and mumbled something; that they let him (defendant) out, and the lieutenant asked him, "Did you hear that?" and he replied, "The man is crazy."

While a dying declaration is not admissible until it appears it was made under a fixed belief and moral certainty that death was impending and sure to follow, the rule is not applied where it is sought to prove an accused remained silent under an accusation of guilt. Defendant contends that the trial court decided the written statement was not admissible as a dying declaration, and therefore the testimony of the police officers and the nurse falls within the same inhibition. He also claims that the testimony of Dr. Champagne showed the condition of DiSimone's mind was such that none of the testimony should have been permitted to go to the jury. An admission may be implied from the conduct of a party charged with crime who remains silent when statements are made in his presence and hearing implicating him in its commission, when the circumstances afford him an opportunity to reply and where a man similarly situated would ordinarily deny the imputation. (*People* v. *Lehne*, 359 Ill. 631; *People* v. *Nitti*, 312 id. 73.) Such a statement is admitted in evidence not as proof of the fact stated but because the accused's silence, when he might, and naturally would, deny it if untrue, is regarded as a circumstance tending to establish by tacit admission the truth of the statement. It is never admissible where at the time it is made the accused unequivocally denies its truth or where his conduct shows clearly that he does not acquiesce in it. (*People* v. *Nitti, supra; People* v. *Harrison*, 261 Ill. 517.) However, the testimony was not objected to and its admission is not subject to review. (*People* v. *Covitz*, 262 Ill. 514; *People* v. *Fisher*, 295 id. 250; *People* v. *Anderson*, 239 id. 168.) Another reason why the contention cannot be entertained is, that the written motion for a new trial set out the grounds relied upon but made no mention of the alleged improper admission of tes-

timony. *People* v. *Colegrove,* 342 Ill. 430; *Herder* v. *People,* 209 id. 50; *Illinois Central Railroad Co.* v. *Johnson,* 191 id. 594.

The testimony of Dr. Champagne does not show the patient was in such stupor that he did not understand the questions asked him or his answers to them. It shows that under stimulation he was able to understand questions and to answer intelligently. The only stimulation administered was strychnine, and the questions were answered pointedly and directly in as plain language as it was possible for anybody to do.

It is claimed the statement of the decedent that defendant was intimate with decedent's wife was incompetent. This claim connot be upheld. If it was not denied when made it was admissible. The test of admissibility of evidence is the connection of the facts proved with the crime charged and whether it tends to show the defendant guilty of that crime. Evidence tending to show other offenses independent of and having no connection with the crime charged is inadmissible, but where the motive for the crime charged is the concealment of other offenses the evidence of such previous offenses is admissible to show motive. (*People* v. *Doody,* 343 Ill. 194; *People* v. *Durkin,* 330 id. 394; *People* v. *Zammuto,* 280 id. 225; *People* v. *Watkins,* 309 id. 318.) If evidence offered has a tendency to prove the crime charged, it is competent even though it also proves a separate, distinct offense. (*People* v. *Pargone,* 327 Ill. 463; *People* v. *Horn,* 309 id. 23.) The alleged intimacy or its concealment might furnish a motive for the killing, and evidence of the existence of that relation was admissible.

It is urged that the circumstantial evidence is not sufficient to show defendant's guilt. Toward the rear of the place of business where defendant was arrested there is a low partition reaching about half way to the ceiling. Between the partition and the ceiling is a lattice. In the cen-

ter of the partition is a pair of short, swinging doors not reaching the floor or the top of the partition. The room back of the partition has a rear door, which was locked and barred. A passage extends along the side of the back room to a toilet in the rear. The bar is on the same side of the room as the passage. Gallicchio, the proprietor, testified that on the night of the killing defendant came in the front door about 8:30 o'clock and greeted him and some of the customers; that they were sitting at a table in front of the bar; that defendant went into the passage leading to the toilet; that he was gone a couple of minutes, came out and joined the witness and the others sitting at the table; that the witness did not remember anyone else going back to the toilet after defendant came out; that some customers came in the front door that evening and some in the side door; that he could not say whether anybody else went toward the toilet before the police officers came in but that he did not see anybody go into the passage after defendant came out. He also testified that about half an hour before defendant came in he heard loud reports like the back-fire of a car or truck. Defendant did not deny going to the toilet and no one testified that anybody else went there or into the passage. He and Gallicchio both testified there was no one in the back room. The ownership of the gun found in the flush-box of the toilet was not directly traced to defendant, but it was shown that while he was acting as bailiff guns were confiscated in several of the courts in which he served. A ballistic expert testified that two of the bullets were fired from the gun found in the toilet. The third bullet was so badly mutilated that it could not be identified as coming from the particular weapon.

Defendant has held various political positions. He was clerk in the immigration division in the office of the clerk of the superior court, docket and bond clerk in the office of the State's attorney, connected with the board of local

improvements, deputy bailiff of the municipal court, and was employed in the city water bureau. At the time of the trial he was on leave. His defense was an alibi. Several witnesses, including a member of the legislature and a ward superintendent, testified to his good reputation as a peaceable and law-abiding citizen. He resides at 1067 West Taylor street, not far from where the killing took place. He testified that he knew the deceased about twenty years and they were very good friends; that he visited him at his store but not at his home; that he lived with his mother, sister and his three children; that on the day of the shooting he arrived home between 4:30 and 5:00 o'clock in the afternoon, stayed there until after 6:00 o'clock, and then walked out on the street to a neighborhood picture show, and, finding a line waiting, walked back to the house about 7:00 or 7:30 o'clock in company with Stanley T. Willett, who went in with him; that he did not hear any shots fired but was told by his mother that she heard some reports; that he left the house about 8:30 and went across the street to Gallicchio's saloon; that he laid his hat and coat on the table, shut the swinging doors, and said, "What's the matter? No card game to-night?" that he walked back out to the bar, talked for a little while and ordered some drinks, and that he was there about half an hour before the police came in and arrested him. Defendant's mother, his sister and brother corroborated his testimony as to his alibi.

The day after his arrest defendant was questioned by officers Pieroth, Bolata and Mau. Mau acted as stenographer. He testified that defendant said he was at home until 7:00 o'clock, went from there to his cousin's soft drink parlor on West Taylor street, stayed there a few minutes, went to a moving picture show but did not go in on account of the crowd standing in line; that he walked back to his house and went in to see if his brother was at home and stayed there about five minutes. Defendant also said he did not go into the toilet at Gallicchio's place of

business; that when he came in there Gallicchio asked him if he heard any shots, and he said no—he had just left the house. Defendant was questioned at length as to these statements and did not deny them. He admitted that when he was asked who was at his home when he came in, he said, "My mother, my sister Helen, my sister Emily, and my two children, Donald and Michael, Jr." He did not mention Willett when he made his statement to the police. Willett did not testify at either trial.

One of the grounds of defendant's motion for a new trial was that he was deprived of Willett's testimony by the conduct of the State's attorney, who informed Willett on the last day of the trial and during its progress that he would not use him as a witness. It appears from the affidavit of the assistant State's attorney that Willett knew where the trial was being conducted and had a conversation with members of defendant's family in the corridor adjacent to the court room before each side rested its case. The affidavit of Willett in support of the motion for a new trial shows that he came to defendant's house about 7:30 P. M.; that defendant was not there but came in ten or fifteen minutes later; that after defendant came in his mother apparently saw something from a window; that she and the persons to whom she spoke appeared very much excited over what they saw, and that he left the house with defendant about 8:30. The affidavit makes no mention of hearing any shots fired. So far as Willett's affidavit is concerned, it contradicts defendant's story of Willett's meeting him and accompanying him home. What occasioned the excitement of the women while Willett was in the house does not appear.

The jury had all the facts before it, including the evidence as to the alibi and defendant's previous good reputation. He did not deny intimacy with Mrs. DiSimone. It was for the jury to determine the weight to be given the testimony. The evidence of the People was sufficient

to convict, and where the verdict is not manifestly against the weight of the evidence we will not set it aside. *People* v. *Abelsky,* 359 Ill. 387; *People* v. *Fitzpatrick,* id. 363.

The criticism of the arguments of counsel for the People is not justified. The heinousness of the crime arising from the basest of motives shown by the testimony fully warranted the penalty fixed by the jury. Defendant had a fair trial.

The judgment of the criminal court is affirmed.

*Judgment affirmed.*