PRESIDING JUSTICE WILSON
 

 delivered the opinion of the court:
 

 Following a jury trial, defendant was convicted and sentenced to concurrent terms of imprisonment for the following offenses: murder (Ill. Rev. Stat. 1981, ch. 38, par. 9 — 1), natural life; aggravated arson (Ill. Rev. Stat. 1981, ch. 38, par. 20 — 1.1), 60 years; armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18 — 2), 60 years, and burglary (Ill. Rev. Stat. 1981, ch. 38, par. 19 — 1), 14 years. We modify the sentence imposed and remand.
 

 On October 2, 1980, in Chicago Heights, Illinois, defendant and a friend, Dennis Adams entered Inez Lazzari’s apartment to steal money and jewelry. Both men carried golf clubs. Ms. Lazzari was 86 or 87 years old and lived alone in an apartment behind a grocery store that her husband owned until his death. Adams told Lazzari that he wanted her money, but she did not comprehend what he said because she only understood Italian. Adams began hitting her on the leg with his golf club. She stood and Adams pushed her. During this ordeal defendant rummaged through drawers to find anything of value. He discovered approximately $20 in half-dollar coins. Adams repeated his demand for money. Defendant allegedly told Adams to stop hitting Ms. Lazzari, but to no avail.
 

 By this time Lazzari was sitting on the floor because her legs were bleeding. She had been struck on the head and there was blood in her hair. According to defendant, Adams took candles out of a drawer and attempted to set one of the bedrooms on fire. Defendant said he ran outside but when he smelled smoke he went back in and discovered that the bedroom and another room were in flames. Adams joined defendant outside a few moments later with packs of cigarettes and two new wallets taken from the apartment. The two young men then went to a nearby restaurant with female friends.
 

 At trial, Lazzari’s neighbor, Alena Troiana, was the first to testify. She stated that Lazzari did not have any relatives in the United States and that she took care of Lazzari, did her grocery shopping and stopped in every day to see if everything was alright. On the afternoon of the incident, she brought Lazzari a few groceries. Lazzari paid for the items with money that she kept in a wallet inside a black purse. At approximately 6 p.m. that evening Troiana brought Ms. Lazzari her dinner. She stated that when she left she made sure that the front and back doors were locked. Troiana then made an in-court identification of a black leather purse as that which belonged to Ms. Lazzari.
 

 Further testifying, Troiana stated that one day when she was looking for Ms. Lazzari’s front door key she opened a drawer and noticed rolls of dimes and nickels. She then identified photographs of Ms. Lazzari and the exterior of the building which housed Ms. Lazzari’s apartment.
 

 Next to testify was Officer Allen Vehrs, who stated that he and another officer, Michael Cammelli, were on routine parol in Ms. Lazzari’s neighborhood when they smelled smoke. They discovered that the smoke was coming from a nearby storefront. After calling the dispatcher for a fire unit and unsuccessfully attempting to enter the front and back doors of the burning building they waited for the unit to arrive. Upon entering the apartment Vehrs observed that drawers were pulled out of the china cabinets and that dressers had been turned upside down on the floor. Ms. Lazzari’s body was found in the hallway. Vehrs described Lazzari as a heavy set woman who wore a large, dark nightgown, the top of which was pulled down exposing her breasts. The bottom was pulled up to reveal her pubic area. Her head was in a small pool of blood and her body was covered with soot. Vehrs further stated that one bedroom was badly charred and that a hole had burned through the floor. In another. bedroom the bed and floor were burned, drawers had been pulled out and items were scattered throughout. He was then asked to identify pictures of the front of the house and several rooms inside as well as pictures of Ms. Lazzari’s body, the back of her head and a picture of her right hand. Vehrs’ narration of the preceding events remained unchanged on cross-examination.
 

 John Valaveris, owner of the Skyline Restaurant in Chicago Heights, testified that at approximately 11:30 p.m. on October 2 defendant and another young man entered his restaurant. Valaveris was immediately suspicious because defendant carried a silver golf club and a yellow or gold sock-like pouch. The other young man (Dennis Adams) had a hammer. Soon afterward two young ladies joined the men. They ordered food and defendant paid the bill ($25 to $28) in half-dollar coins. Valaveris estimated that defendant had a total of 50 or 60 coins.
 

 Next, Detective John Schmidt, who had been dispatched to investigate the fire, testified that when he saw Ms. Lazzari’s body her breasts and pubic area were exposed. She did not have undergarments on and her body was bruised. Schmidt then identified a picture of Lazzari’s injuries and further testified that he had noticed swelling around her mouth and that there appeared to have been an attempt to remove a gold wedding band on her finger. Schmidt was also shown a photograph of the hand injuries. He then identified a pair of tongs, hand tools, a baseball bat and a camera that he took from the apartment and placed in the property room of the Chicago Heights police station.
 

 When Schmidt returned to Ms. Lazzari’s apartment the next morning he discovered a bent golf club near the area where her body was found. He also discovered a black leather purse which contained a wallet and religious objects. These items were identified at trial.
 

 Schmidt further testified that on October 16, 1980, he talked to defendant, who by that time had been placed under arrest and was in custody. After he advised defendant of his Miranda rights Schmidt said that defendant confessed to having been involved in the murder and explained how the incident occurred. Defendant said that he and Adams were together on October 2 and that he decided to burglarize the Lazzari home because he knew that Ms. Lazzari was elderly and had money and jewelry. Defendant also said that he initiated these plans and that Adams agreed with them. When they arrived at Ms. Lazzari’s home they noticed that lights were on. They peered through the window from the sidewalk and saw Lazzari in a chair watching television. Both men walked to the rear door and forced it open. Each carried a golf club. Ms. Lazzari approached them. Adams asked her where she kept her money. When it became evident that Ms. Lazzari did not understand English, Adams began to hit her legs with his golf club. Defendant tojd Officer Schmidt that he was not sure, but he thought that he struck Ms. Lazzari once or twice. He also said that Adams continued to strike Lazzari with his golf club even after she had fallen onto the hallway floor. Defendant found a camera that he decided he did not want and in a dresser drawer he found $25 or $27 in half-dollar coins. He said that because Adams had not worn gloves he set the apartment on fire to destroy fingerprints. He allegedly made an effort to extinguish one of the fires but could not and ran out the door. Defendant stated that he and Adams went to the Skyline Restaurant with two young women they knew, ordered food and paid the bill with the half-dollar coins. Thereafter, defendant was interviewed at the police station by an assistant State’s Attorney.
 

 On cross-examination Schmidt stated that he destroyed his handwritten notes of his conversation with defendant because a court reporter was present to record what was said. Schmidt also stated that defendant’s statements and his conversation with the assistant State’s Attorney were substantially the same. Under further questioning, however, Schmidt stated that he had two conversations with defendant. During the first conversation, defendant stated that he might have struck Ms. Lazzari once. Schmidt said that during the second conversation, which was the only one that was transcribed by the court reporter, defendant denied striking Ms. Lazzari. Schmidt also testified that during the second conversation defendant said that he told Adams to stop beating Ms. Lazzari. Schmidt never asked defendant how he tried to stop Adams from assaulting Ms. Lazzari, however. It was further revealed that Schmidt had stated at a preliminary hearing that defendant said that “someone else” struck Ms. Lazzari with a golf club, had started the fire and that defendant could not recall whether he had hit her or not.
 

 Assistant State’s Attorney Joseph Caliban testified that he interviewed defendant at the Chicago Heights police station and that a court reporter transcribed defendant’s statements into 10 typed pages which defendant initialed on the bottom after he read them. Near the end of the statement, defendant added the words “he [Adams] was acting crazy.” Caliban then read defendant’s statement verbatim in its entirety.
 

 Last to testify was Dr. Lee F. Beamer of the Cook County Medical Examiner’s office. Beamer stated that Ms. Lazzari weighed 163 pounds, measured five feet in height and had numerous bruises and lacerations on her head, face, chest, arms and legs which had been caused by a blunt instrument. Soot was noted in her nose, mouth and windpipe. Beamer then identified 12 pictures of injuries to Lazzari’s head, knee, thighs, lower legs, shoulder, back and right hand. He attributed the cause of death to the combined effects of carbon monoxide intoxication and multiple contusions and abrasions.
 

 At the conclusion of Beamer’s testimony, defendant waived cross-examination and rested his case. Following the State’s motion to admit certain exhibits into evidence, the jury was excused. A number of photographs were then admitted into evidence, most of them over defendant’s objections. Defendant made a motion for a directed verdict and argued that there was insufficient evidence to prove that he was responsible for the charges against him and that the evidence only showed that he attempted to put the fire out. Denying this motion, the trial court reasoned that the question of accountability was for the jury to decide. Defendant was subsequently found guilty of all charges and judgment was entered. This appeal followed.
 

 Opinion
 

 We first consider defendant’s contention that the State introduced inflammatory and irrelevant evidence, the total effect of which subjected him to a trial based on the emotional nature of the death of an elderly woman. We disagree for the following reasons.
 

 Alena Troiana, the first witness to testify at trial, gave an account of her relationship with Ms. Lazzari which, in our opinion was not unduly sympathetic. Rather, it explained how she knew Lazzari, who lived nearby, the type of life Lazzari led and how Troiana became aware of the fact that her neighbor had died. Troiana’s identification of the black leather purse that belonged to Ms. Lazzari was clearly relevant since it had been established at trial that $25 was stolen from it during the course of the offense. Also, her identification of the religious items in the purse in our judgment was not an attempt by the State to elicit sympathy for Lazzari but instead rendered Troiana’s testimony more credible. We further note that defendant objected only twice during the course of Troiana’s testimony, neither of which instance was in response to testimony about the purse or religious material. This issue can therefore be considered waived on appeal. Moehle v. Chrysler Motors Corp. (1982), 93 Ill. 2d 299, 303, 443 N.E.2d 575.
 

 Defendant next contends that he was prejudiced by Dr. Reamer’s testimony concerning Lazzari’s cause of death. This testimony in pertinent part was as follows:
 

 “Q: Now, aside from the injuries that you described on these photographs, did you find any other injuries or abrasions and so forth particular to the vaginal area?
 

 A: Yes. I found—
 

 Mr. Lee: Objection, Judge, I am going to object to that. How is that possibly relevant to this case.
 

 The Court: Sustained.
 

 Mr. Phillips: The condition of the body following death, your Honor.
 

 Mr. Lee: May I have a side bar, then, so I can make comment outside the presence of the jury?
 

 The Court: Yes, sir.”
 

 While we agree that the State’s question was an improper reference to a collateral crime (rape) for which defendant was not being tried, this colloquy was harmless in light of the overwhelming evidence of defendant’s guilt. (People v. Lindgren (1980), 79 Ill. 2d 129, 141, 402 N.E.2d 238.) Additionally, any possible prejudice was minimized by the court’s subsequent instruction to the jury “to disregard and strike from your minds any recollection of the last question that was posed to Dr. Beamer.” Also, the court’s final instructions to the jurors included an admonition to disregard questions which were withdrawn or to which objections were sustained and to disregard testimony which the court refused or which was stricken. The record further reveals that the line of questioning objected to in this instance was not pursued. Instead, the next inquiry by the State concerned Beamer's tests to determine Lazzari’s cause of death and his results and medical conclusions therefrom. There was no further reference to vaginal injuries or abrasions suggestive of rape. We therefore find that defendant was not prejudicially harmed.
 

 Defendant next assigns error to the trial court’s admission of 14 photographs of Lazzari’s injuries. He argues that the only question before the court was whether defendant’s admitted involvement in the occurrence established legal accountability for the crimes charged. Defendant contends that the pictures were not probative of this issue.
 

 We initially note that the admission of photographs is a matter within the sound discretion of the trial court. (People v. Foster (1979), 76 Ill. 2d 365, 375-76, 392 N.E.2d 6; People v. Stocks (1981), 93 Ill. App. 3d 439, 447, 417 N.E.2d 1080.) Photographs are admissible despite their gruesome or inflammatory nature if they depict the amount of force used in the crime or tend to corroborate or not corroborate the testimony of the pathologist or other witnesses. People v. Lindgren (1980), 79 Ill. 2d 129, 143-44, 402 N.E.2d 238; People v. Williams (1975), 60 Ill. 2d 1, 12, 322 N.E.2d 819.
 

 Here, the photographs showed various parts of the victim’s battered and soot-covered body. Two pictures were of the victim’s shaven head and were taken at the morgue. Our careful review of the description of these pictures in the record leads us to conclude that none were gruesome and shocking and that each was relevant to the degree of force used to carry out the murder. According to defendant, Adams “acted crazy” and repeatedly beat Lazzari to unconsciousness or death. Thus, the pictures were particularly relevant because they revealed that virtually no part of Lazzari’s body was left unscathed by the perpetrator and that the murder was committed in a deliberate manner. (People v. Kirkpatrick (1979), 70 Ill. App. 3d 166, 176, 387 N.E.2d 1284.) Additionally, the photographs corroborate the testimony of Dr. Beamer as to the extent of the inflicted injuries. We therefore find that the photographs did not inflame and prejudice the jury and that their admission was not an abuse of discretion.
 

 Defendant further urges that the prosecutor’s closing argument was inflammatory and that it impugned defense counsel’s character. During closing argument the prosecutor referred to defendant as a ghoul, told the jury not to be swayed by a clever attorney and labeled defendant’s theory of the case as the oldest trick in the book.
 

 The characterization of defendant as a ghoul was as follows: “When the fires are being set, does he [defendant] call the fire department? Does he tell them, hey, there is an old lady in the apartment that is on fire? No, what does he do? He waits and after that act is done, the[y] walk together, pick up a couple of girls and like a couple of ghouls go to the Skyline Restaurant and have dinner.” This characterization was stated in argument only once.
 

 In view of the fact that defendant admitted that both he and Adams were armed with golf clubs, that he struck Ms. Lazzari once or twice, that he rummaged through the apartment, found several half-dollar coins and entertained lady friends at dinner that same evening, it appears that these remarks were supported by the record and did not have any bearing on the jury’s verdict. (People v. Franklin (1976), 42 Ill. App. 3d 408, 416, 355 N.E.2d 634.) We further believe that the error committed by the two latter comments (that the jury should not be swayed by a clever attorney and that defendant’s defense was the oldest trick in the book) was obviated when the trial court properly sustained defendant’s objections. Furthermore, the Court instructed the jury that neither opening statements nor closing arguments are evidence and that any statements made in an argument which were not based on the evidence or reasonable inferences drawn therefrom should be disregarded. Also, the mere occurrence of improper remarks does not mandate reversal. To merit reversal defendant must show that the statements constituted a material factor in his conviction, resulted in substantial prejudice to him or that the verdict would have been different had the remarks not been made. (People v. Baker (1979), 78 Ill. App. 3d 411, 420-21, 396 N.E.2d 1174.) In this case we are unable to say that the remarks were so prejudicial that defendant did not receive a fair trial or were so flagrant as to threaten deterioration of the judicial process. The character and scope of argument to the jury is left very largely to the trial court, and every reasonable presumption must be indulged in that the trial judge performed his duty and properly exercised the discretion vested in him. The trial court is, therefore, in a better position than a reviewing court to determine the prejudicial effect, if any, of a remark made during argument and unless a clear abuse of discretion is shown, its ruling should be upheld. (People v. Smothers (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324.) Here, we find no error or abuse of discretion which requires reversal.
 

 Defendant’s final contention is that the court’s imposition of a sentence of natural life for his murder conviction is excessive and unfairly disparate when compared with that of his codefendant, Dennis Adams, who pled guilty in a bench trial to all charges and was sentenced to 28 years. We agree.
 

 It is well settled that it is not the function of a reviewing court to serve as a sentencing court and that absent an abuse of discretion by the trial court, a sentence will not be disturbed upon review. (People v. Cox (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541.) In determining a sentence, the trial court is authorized to consider the defendant’s character, the nature and circumstances of the offense as well as his mentality, age, credibility and demeanor. (People v. Requena (1982), 105 Ill. App. 3d 831, 838, 435 N.E.2d 125.) A sentence imposed within the statutory limits will not be reduced merely because we, as a reviewing court, might have imposed a different punishment. People v. Perruquet (1977), 68 Ill. 2d 149, 156, 368 N.E.2d 882.
 

 Murder is a felony for which a sentence of natural life imprisonment may be imposed if the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. (Ill. Rev. Stat. 1981, ch. 38, par. 1005 — 8— 1(a)(1)(b).) In the instant matter, the sentence imposed was within the statutory limit. Upon entering sentence, the court indicated that it had considered the above-mentioned factors and, of course, the fact that the victim was 86 or 87 years old. The court stated further, however, that the offense exhibited wilful and wanton cruelty and that “the onus of that test must fall equally on each defendant. There can’t be any difference between them, by and large, by virtue of age or in conduct, and in this case Mr. Holloway says the other defendant did it, the other defendant testified here that Holloway did it, so my view would be that they stand on an equal par.”
 

 While we agree with the court’s reasoning that both defendants “stand on equal par,” we are of the opinion that in view of this fact as well as other similarities, defendant’s sentence was unnecessarily disparate when compared.to Adams’. Clearly, the revolting nature of this crime is a compelling factor in aggravation of defendant’s sentence; however, the evidence fails to reveal that defendant alone was responsible for the murder. As the court noted, each defendant placed the blame on the other.
 

 Also, we observe a general similarity in defendants’ mental capacity as well as their chronological age. A psychiatric report dated February 26, 1981, indicated that Adams was not mentally fit for trial because he was unable to cooperate with his defense counsel due to an “Atypical Organic Mental Disorder.” Holloway’s psychological report was equally discouraging. It revealed that his full scale IQ was 65 and that he functioned intellectually in the “mentally impaired range and academically from the mid-second to mid-third grade level.” Further, there was only a two-year age differential between the young men (at the time of the incident Holloway was 18, Adams was 16), and each lived with and was financially dependant on at least one parent.
 

 Our careful review of the foregoing facts leads us to conclude that defendant’s sentence was excessive. We are well aware that the evidence reveals that defendant instigated the criminal scheme, however, and that the murder was a brutal and heinous one. Thus, we find that this is a sufficient basis upon which to impose a more severe sentence for defendant than Adams. Defendant’s penalty for murder is therefore modified to 40 years with an extended term of 40 years. (Ill. Rev. Stat. 1981, ch. 38, pars. 1005-8-1(a)(1)(a), 1005-8-2(a)(1) and 1005 — 5—3.2(b)(2).) The judgment and sentences imposed for aggravated arson, armed robbery and burglary are affirmed.
 

 Accordingly, the sentence for murder is modified as stated and the cause is remanded to the circuit court for proceedings consistent with this opinion.
 

 Affirmed in part, modified and remanded.
 

 LORENZ and MEJDA, JJ., concur.