THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAMUEL E. CARTER et al., Defendants-Appellants.

First District (3rd Division) Nos. 86—1111, 86—1127, 86—1305 cons.

———

Opinion filed March 16, 1988.

Paul P. Biebel, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago, for the People.

JUSTICE McNAMARA delivered the opinion of the court:

After a jury trial, defendants Samuel Carter and Ray C. Fergerson were convicted of the murder of Maurice Coleman and sentenced to 20 and 25 years in prison, respectively. On appeal, defendants contend the State failed to prove them guilty beyond a reasonable doubt; that the State failed to prove that the beating administered to Coleman caused his death; that the trial court should have dismissed the murder indictment because Coleman did not die until 21 months after the alleged beating; that the trial court erred in denying defendants' motion for discharge based on preindictment delay; that the trial court erred in refusing to instruct the jury on the offense of involuntary manslaughter; that defendant Fergerson was denied effective assistance of counsel; that defendants' rights were violated by the admission into evidence of allegedly incriminating statements by codefendants; and that statements made by the prosecutor during his closing argument denied defendants a fair trial.

Patricia McKinley testified for the State that on July 25, 1983, she was talking with Coleman outside her apartment building. The building was owned by the El Rukn street gang, which provided 24-hour security for the building. Coleman entered the building before McKinley. When McKinley entered the building, she screamed because her apartment door was open and Coleman was carrying her record player out of her apartment. Although McKinley told Coleman to leave to avoid problems with El Rukn management, building security had already arrived. They directed McKinley to go into her bedroom. From that point on McKinley could not see what was happening in the living room.

Lewis Sims lived in an apartment two floors directly above McKinley's apartment. On the evening of July 25, 1983, Sims heard a scream and came out of his apartment to see what was happening. Sims saw five men enter McKinley's apartment. Sims descended the stairs so he could see into the apartment through a partially opened door.

Sims identified defendants as two of the men in the apartment. Sims had seen Fergerson working as a security guard at the front of the building on previous occasions. Sims saw Coleman in the apartment, on his knees and handcuffed. Sims also saw defendants hitting Coleman with black sticks. Coleman was also kicked by this group of men. Sims viewed this activity for 2½ minutes before one of the men came to the door and told Sims to go back to his apartment.

Sims returned to his apartment and watched through his window. Sims saw four men, including defendants, carry Coleman out of the

building into a building across the street. Approximately 20 to 25 minutes later, a van pulled up in front of the building and three men threw Coleman inside.

Mary Brown, who lived with Sims on July 25, 1983, testified that she stood with Sims looking out their apartment window, and saw the men dragging a person to the building across the street. Brown identified two of the men as defendants. Brown did not give the police this information during their initial investigation because she was afraid, since she still lived in the same apartment building.

Sims did not go to the police until November 1983, when he heard through Coleman's sister that Coleman was still in a coma. At this time, Sims identified photos of Carter and another man as two of the men involved in the beating. Sims was contacted by the police in May 1985 and asked to view some additional pictures. Carter's picture was in the group of pictures. Sims also identified Fergerson at this time while looking through books of pictures. Sims later identified both defendants in separate lineups.

The State also presented the testimony of Anthony Sumner, a former El Rukn member who knew both defendants. Sumner worked as a security guard at another El Rukn building and knew that defendants worked security at the building where this incident occurred. Sumner testified that he learned of the beating a few days after it took place in a conversation at the building with both defendants present. In this conversation, Fergerson stated they put Coleman "under arrest" and Carter said Fergerson "hit Coleman with an uppercut and then wore him out," meaning they beat him. Sumner stated that he testified at this trial in exchange for being allowed to plead guilty to conspiracy to deal drugs instead of being charged with murder.

. Coleman was admitted to Jackson Park Hospital on the day of the beating and lapsed into a coma on the following day. Coleman remained in a coma until he died on April 27, 1985. Dr. Edmond Donoghue, a forensic pathologist, testified as to the postmortem examination he conducted on Coleman. The medical records revealed that Coleman suffered from blunt trauma as the result of being hit with a blunt object. Dr. Donoghue's opinion was that Coleman died of bronchopneumonia due to a subdural hematoma due to the beating.

■ On appeal defendants first contend that the State failed to prove them guilty beyond a reasonable doubt. Sims was admittedly the only person to witness defendants beating the victim. Defendants claim that Sims' testimony was not worthy of belief because Sims was previously convicted of a felony, admittedly violated parole, and con-

ceded instances of drug abuse. These facts were brought out during cross-examination of Sims, and it is the duty of the trier of fact to determine the credibility of the witnesses and the weight to be given their testimony. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) Because the jury was aware of the factors which would allow it to adequately judge the credibility of Sims, we will not substitute our judgment for that of the jury.

■ Defendants further claim that Sims' testimony was unworthy of belief because of his delay in reporting the incident to the police. Sims testified that he did not learn until November that Coleman remained in the hospital and had been in a coma since the beating. This information prompted Sims to report his knowledge of the incident to the police. The jury heard Sims' explanation of the delay and took this into consideration when deciding the weight to be given to this testimony.

■ Sims testified that he identified Carter's picture at the police station in November 1983. Defendants contend that Fergerson's picture was in the gang crime books on the day Sims viewed the books in November and therefore Sims failed to identify Fergerson four months after the crime. Sims testified that he did not see a picture of Fergerson in November 1983, but he was able to identify him from similar books shown to him in May 1985. At trial, a police officer testified that he could not be certain that the gang crime books produced as evidence at trial were in the same condition in November 1983 as they were at the time of trial. Therefore there is no certainty that Sims failed to identify defendant in November 1983. Defendants point out certain inconsistencies between the testimony of Sims and the police. The jury heard these inconsistencies and determined the weight and credibility to be given to all witnesses' testimony.

■ Defendants also attack the credibility of the testimony of Mary Brown. Brown was questioned earlier by the police and denied having any knowledge of the incident. It was not until several days before trial that Brown told police she saw defendants carry Coleman from the building. Brown explained the delay however, by testifying that while she was still living in the El Rukn building, she was afraid to talk to the police about the incident. At the time of trial, Brown no longer lived in the building. The jury was informed of the delay and of her explanation of the delay, and with this information, it was able to assign the appropriate weight and credibility to the testimony.

■ Defendants maintain that Sumner's testimony is not worthy of belief because he testified in exchange for a less serious charge,

had a previous conviction, and signed a written statement recanting testimony previously given to a grand jury. This statement was taken by the attorney for Jeff Fort, leader of the El Rukn gang. Sumner testified that when this statement was taken, another El Rukn member was present and told him what to say. The jury heard all the testimony regarding this statement, the statement itself was read to the jury, and the jury was responsible for believing or discrediting the statement and all testimony regarding the statement.

■ In the present case, the jury was instructed on the State's burden. The jury determined the credibility of and the weight to be given each witness, and the jury was aware of all inconsistencies and possible motivations for testifying. We find the evidence was not so improbable as to justify a reasonable doubt of defendants' guilt. *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313; *People v. Thomas* (1979), 72 Ill. App. 3d 28, 389 N.E.2d 1316.

■ ■ Defendants next contend that the State failed to prove beyond a reasonable doubt that the beating on July 25, 1983, caused Coleman's death from bronchopneumonia on April 27, 1985. Defendants argue that the doctor who performed the autopsy gave no basis for his asserted connection of the alleged beating with the ultimate cause of death, which was bronchopneumonia. The State's burden is not to prove that the defendant's act is the sole and immediate cause of death, but that the defendant's act was, beyond a reasonable doubt, a contributing cause to a death such that the death did not result from a source unconnected with the defendant's act. (*People v. Brown* (1978), 57 Ill. App. 3d 528, 373 N.E.2d 459; *People v. Brown* (1973), 9 Ill. App. 3d 730, 293 N.E.2d 1.) The existence of a time interval between the defendant's act and death does not preclude such a causal link. (*People v. Hughes* (1977), 46 Ill. App. 3d 490, 360 N.E.2d 1363.) Extensive medical testimony is not always necessary to show this causal relationship between death and an act of the defendant. (*People v. Jones* (1961), 22 Ill. 2d 592, 177 N.E.2d 112.) When the facts engender such an obvious association between the act and death that the connection is easily understood from common knowledge and experience, no strenuous technical explanations are required by the law as adequate proof. *People v. Jones* (1961), 22 Ill. 2d 592, 177 N.E.2d 112; *People v. Brown* (1978), 57 Ill. App. 3d 528.

■ In the present case, medical records showed that upon being admitted to the hospital on July 25, 1983, Coleman was unconscious and had shallow respiration. An examination showed that he was in a coma and suffering from multiple abrasions and contusions to the head area. He was also suffering from a subdural hematoma caused

by blunt trauma consistent with being hit by a blunt object. Coleman remained in a coma and was transferred to Oak Forest Hospital on August 15, 1983. He remained in a coma until he died on April 27, 1985. Dr. Donoghue stated his opinion to be that Coleman died of bronchopneumonia due to a subdural hematoma due to the beating. Dr. Donoghue's testimony was detailed and conclusive as to the cause of death. We disagree that the record fails to provide any basis for the expert's testimony, and we therefore find that the State met its burden of proving beyond a reasonable doubt that the beating inflicted by defendants caused Coleman's death.

■■■ Defendants also contend that the common law "year and a day" rule precludes their convictions for murder. In *People v. Corder* (1922), 306 Ill. 264, 137 N.E. 845, our supreme court recognized this common law rule that where the death occurs more than a year and a day after the alleged criminal act, the death is conclusively presumed to be unconnected to that act. The beating in the present case took place on July 25, 1983, and Coleman died 21 months later.

In Illinois, the common law "year and a day" rule was codified in 1949 (Ill. Rev. Stat. 1949, ch. 38, par. 365), and provided: "In order to make the killing either murder, manslaughter, or reckless homicide, it is requisite that the party die within a year and a day after the stroke received or the cause of death administered, in the computation of which the whole of the day on which the hurt was done shall be reckoned the first." When a new code of criminal procedure was adopted in 1961, this section was not included. (Ill. Rev. Stat. 1961, ch. 38, par. 35—1.) Defendants maintain that the common law rule has not been abrogated by statute or decision of our supreme court and therefore the rule is in effect and their indictments should have been dismissed.

Defendants rely on *People v. Davis* (1953), 1 Ill. 2d 597, 116 N.E.2d 372, and the court's statement therein that absent legislative intent to the contrary, the repeal of a statute declaratory of the common law does not necessarily abolish the common law. In *Davis*, the legislature amended a statute governing sentencing for reckless driving by deleting the words "in the discretion of the court." The defendant argued the effect of the amendment was to give sentencing authority to the jury. The court found it likely, however, that the legislature determined that the language deleted was unnecessary since the court performs that duty under common law without any statutory direction. It was in this context that the court said that the repeal of a statute declaratory of common law does not necessarily abolish the common law. The statute declaratory of common law in *Davis*

is substantially different than the statute in the present case. Here, the legislature codified the "year and a day" rule in 1949 and subsequently repealed it in 1961. We believe that by not including the previously codified section in 1961, the legislature showed an intent to abrogate the "year and a day" rule in Illinois.

We also follow the holding of this court that the "year and a day" rule does not exist in Illinois. (*People v. Mudd* (1987), 154 Ill. App. 3d 808, 507 N.E.2d 869.) There, the court noted that the "year and a day" rule gradually began to disappear as courts and legislatures recognized advances in medical and related sciences which resulted in the sustaining or prolonging of life in the face of trauma or disease.

■■■ Defendants' next contention is that they were denied their right to a fair trial under the fourteenth amendment when the trial court denied a motion for discharge based on preindictment delay. Although Fergerson never moved for discharge of his indictment and thus waived the issue, we shall discuss the issue as to both defendants.

The Supreme Court has held that due process requires dismissal if substantial prejudice resulting from preindictment delay is shown. (*People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244, citing *United States v. Marion* (1971), 404 U.S. 307, 30 L. Ed. 2d 468, 92 S. Ct. 455.) Clearly, the statute of limitations is an accused's chief safeguard against prejudicial delay between the offense and the charge. But the statute of limitations does not fully define an accused's rights with respect to the events occurring prior to indictment. (*Lawson*, 67 Ill. 2d 449, 367 N.E.2d 1244.) In determining whether dismissal for preindictment delay is proper, courts engage in a process which attempts to balance the competing interests of the defendant and the State. Where a delay between the crime and the indictment exists, the defendant must come forward with a clear showing of actual and substantial prejudice. If the defendant makes such a showing, the burden shifts to the State to show the reasonableness, if not the necessity, of the delay. *Lawson*, 67 Ill. 2d 449, 367 N.E.2d 1244.

■■■ The criminal act in the present case took place in July 1983. Sims identified Carter in November 1983. The police received additional information from Sumner in May 1985. Based on this additional corroborating evidence, the State obtained indictments against both defendants in June 1985. In his petition for discharge, Carter stated that due to the delay, he was unable to locate witnesses to establish his whereabouts on the date of the beating or witnesses to the beating who could exonerate him.

In *Lawson*, the court expressly cautioned that neither merely as-

serting an inability to recall nor demonstrating the possibility of prejudice is enough to constitute actual and substantial prejudice. (*Lawson*, 67 Ill. 2d at 459.) In *People v. Park* (1980), 81 Ill. App. 3d 108, 400 N.E.2d 966, *cert. denied* (1981), 449 U.S. 1085, 66 L. Ed. 2d 810, 101 S. Ct. 873, the defendant contended that the unavailability of an informant to testify at trial constituted actual and substantial prejudice caused by the delay. The court found no indication in the record, however, that the informant's testimony would have aided the defendant and therefore held that defendant had only made a showing of a possibility of prejudice, and not actual or substantial prejudice. Here, similarly, Carter has only shown a possibility of prejudice. The petition for discharge of the indictment did not specify the witnesses who could not be located or what their testimony would be. The trial court did not err in refusing to discharge on the basis of preindictment delay.

■ Defendants contend further that the trial court denied them their right to a fair trial by refusing to instruct the jury on the included offense of involuntary manslaughter. Defendants maintain that the beating was administered without an intention to kill and that the record included "some evidence" on the issue of involuntary manslaughter.

The crime of involuntary manslaughter requires that the acts committed by the offender be committed recklessly. (Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a).) An important difference between involuntary manslaughter and murder is the mental state which accompanies the conduct causing the homicide. (See *People v. Gresham* (1979), 78 Ill. App. 3d 1003, 398 N.E.2d 398.) Involuntary manslaughter is established when the acts which caused death are done recklessly such that the person disregards a substantial and unjustifiable risk. Ill. Rev. Stat. 1985, ch. 38, pars. 9—3(a), 4—6.

■ In the present case, there was no evidence adduced that the conduct of defendants was merely reckless. Coleman was handcuffed, on his knees, with several people present as he was beaten with sticks. Coleman never came out of a coma which resulted from the beating. Defendants' deliberate acts in the present case did not support an instruction for involuntary manslaughter.

■ Furthermore, defendants' claim that they did not intend to kill Coleman is not determinative on the issue of manslaughter instructions. The severity of defendants' actions certainly gave them knowledge of the probability of death or great bodily harm, sufficient to constitute murder. The intent to kill may be inferred by the vicious character of an assault. See *People v. Allum* (1967), 78 Ill. App. 2d

462, 223 N.E.2d 187, citing *People v. Winters* (1963), 29 Ill. 2d 74, 193 N.E.2d 809.

 Defendants' next contention is that the prosecutor injected highly prejudicial evidence into the case by suggesting to the jury that Fergerson's attorney was the law partner of the attorney for Jeff Fort, the leader of the El Rukns. At trial, Sumner testified that he was summoned by another El Rukn member to meet with Mr. Murphy, Fort's attorney. Sumner had previously spoken with Fort on the telephone. At this meeting with Murphy, Sumner signed a statement admitting that previous testimony he gave before a grand jury was untrue. Defendants used this statement to impeach Sumner's credibility at trial. On redirect examination, the State elicited the circumstances surrounding the taking of the statement. In response to a question by the State, Sumner stated that Murphy was Fergerson's attorney's partner. The trial court sustained defendants' objection to the question. Defendants claim this was an attempt to prejudice the jury against Fergerson's attorney.

Defendants' reliance on *People v. Stock* (1974), 56 Ill. 2d 461, 309 N.E.2d 19, is misplaced. In *Stock*, the court reversed defendant's conviction based on remarks of the prosecutor in his closing argument. The prosecutor in *Stock* argued evidence not in the record, accused the defense attorney of suborning perjury and referred to defendant's failure to testify. The error found in *Stock* is clearly greater than any possible error created here by the prosecutor's reference to an association between the attorneys. Furthermore, any possible prejudicial impact of this question was cured when the trial court sustained defense counsel's objection to the question. (*People v. Boyd* (1980), 88 Ill. App. 3d 825, 410 N.E.2d 931, *cert. denied* (1981), 454 U.S. 1080, 70 L. Ed. 2d 613, 102 S. Ct. 633.) In addition, this line of questioning was not a material factor in defendants' convictions and therefore even if prejudicial would not require reversal. See *Boyd*, 88 Ill. App. 3d 825, 410 N.E.2d 931; *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.

 In the next claim on appeal, Fergerson claims he was denied effective assistance of counsel by the failure to move for severance after Sumner testified regarding Carter's statements of Fergerson's involvement in the beating. In *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061, our supreme court adopted the test for challenges to effective assistance of counsel as stated by the Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 466 L. Ed. 2d 674, 104 S. Ct. 2052. In *Strickland*, the Court held that constitutionally guaranteed assistance of counsel has not been provided if the

defendant can prove that counsel's representation fell below an objective standard of reasonableness and that counsel's shortcomings were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. The Court also indicated a defendant whose result is reliable. The Court also indicated a defendant must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (446 U.S. at 694, 80 L. Ed. 2d at 697, 104 S. Ct. at 2068.) To assist lower courts in following these guidelines, the Supreme Court also stated that a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. 446 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

■■■ In the present case, Fergerson has not shown that the result in this case would have been different if counsel had moved for severance. Carter moved for severance and the trial court denied this motion. We find no basis in the record upon which the trial court would have reached a different ruling on a severance motion filed by Fergerson. Furthermore, without the testimony of Sumner, there was sufficient evidence to demonstrate Fergerson's guilt. The jury heard the testimony of the eyewitness Sims and the strong corroborating testimony of Brown. Based solely on this evidence, the jury could have found Fergerson guilty. For this reason we find that Fergerson has not shown that the result in this case would have been different if counsel had moved for severance. Therefore Fergerson has not met the requirements of *Strickland* and we find no merit in his claim of ineffective assistance of counsel.

■■■ Fergerson, in the context of his ineffective assistance argument, and Carter in a separate argument, both contend that the admission into evidence of the testimony of Sumner regarding their statements was a violation of their sixth amendment right to confrontation. In this context, Carter claims the trial court erred in not granting his motion to sever.

At trial, Sumner testified that he was present at a conversation in which Fergerson stated that they caught Coleman and put him "under arrest," and Carter stated that Fergerson hit Coleman with an uppercut and then they beat him. Neither defendant made an objection to these statements, and therefore consideration of these contentions could be considered waived on appeal. We will, nonetheless, address the admissibility of these statements in regard to defendants' right to confrontation and the trial court's decision not to sever defendants' trial.

In support of their contentions that this testimony violated their rights, defendants cite *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, and *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056. In *Bruton*, the Supreme Court held that in the context of a joint trial the use of a nontestifying codefendant's confession which inculpates another defendant violates that defendant's rights under the confrontation clause. In *Lee v. Illinois*, the Court applied the rule of *Bruton*.

Both *Bruton* and *Lee* reversed convictions and remanded the cases because a nontestifying codefendant's confession was introduced in a joint trial and used against the other defendant. Both decisions stressed the strong motivation of the codefendant to implicate the other defendant and exonerate himself. This circumstance differentiates these cases from the present case. *Bruton, Lee,* and the other cases cited by defendants involve codefendants' post-arrest statements given to police or in response to other interrogation. In contrast, the statements in the present case were testified to by a third party, and made under circumstances which would not have the post-arrest implications of the statements in *Lee* and *Bruton*.

In the present case, we find no error in the admission of Sumner's testimony regarding defendants' conversation discussing the incident. The statement does not have the unreliability created by the post-arrest confession of a codefendant which implicates the other defendant. Here, both defendants were present at this conversation and neither denied their participation.

■ Defendants' final contention is that the prosecutor's improper and prejudicial closing argument denied them a fair trial. Defendants challenge several statements in the State's closing argument. First, defendants claim that it was improper for the prosecutor to state that the police must have believed Sims because the police picked up defendants based on Sims' identification. The prosecutor has the duty to discuss the witnesses and their credibility. (*People v. Burba* (1985), 134 Ill. App. 3d 228, 479 N.E.2d 936.) Within this duty, however, such comments must be based on facts appearing in evidence or on legitimate inferences therefrom. (*People v. Jackson* (1986), 145 Ill. App. 3d 626, 495 N.E.2d 1207.) In the present case, the prosecutor's remarks were fair comment on Sims' credibility. After Sims identified photos of Carter on two occasions, the police brought him in for a lineup. The prosecutor's statement was a fair inference from the evidence presented and did not prejudice defendants' case.

■ ■ Defendants next challenge statements by the prosecutor

concerning the El Rukn gang. The prosecutor stated that this case informed the jury about everything they needed to know about El Rukns and specifically that the El Rukns have killed more people than the death penalty has in 20 years. It is clear that the prosecutor was arguing facts not in evidence and it was on this basis that the trial court sustained an objection and warned the prosecutor about arguing outside the record. Improper remarks made by a prosecutor do not require reversal unless they result in substantial prejudice to defendant. (*People v. Medley* (1983), 111 Ill. App. 3d 444, 444 N.E.2d 269.) Further, to merit reversal, a defendant must show that the statements constituted a material factor in his conviction, or that the verdict would have been different if the remarks had not been made. (*People v. Baker* (1979), 78 Ill. App. 3d 411, 396 N.E.2d 1174.) Here, the jury was obviously aware, through evidence that was properly in the record, of the involvement of El Rukns in this incident. Any error injected by these statements also was obviated when the trial court sustained defendants' objections and instructed the jury that neither opening statements nor closing arguments are evidence and any statements made in argument which were not based on the evidence or reasonable inference drawn therefrom should be disregarded. (See *People v. Holloway* (1983), 119 Ill. App. 3d 1014, 457 N.E.2d 466.) Overall, we cannot say that such statements resulted in substantial prejudice to defendants' defense or materially contributed to defendants' convictions.

Defendants also claim error in the prosecutor's statement that Sumner was in jail at the time he testified and he was going to plead guilty to a charge that would continue to keep him in jail. We find no error in the prosecutor's statement. The evidence illustrated that Sumner was testifying in exchange for a lesser charge. Sumner admitted that he was in jail at the time and it was a fair inference that he would remain in jail after pleading guilty to conspiracy to sell drugs. We find that the prosecutor did not argue facts not in evidence. His remark was proper comment on the evidence or a legitimate inference therefrom. That Sumner subsequently received probation rather than a jail sentence does not render the prosecutor's inference improper or prejudicial.

For the foregoing reasons, the judgments of the circuit court of Cook County are hereby affirmed.

Judgments affirmed.

RIZZI and FREEMAN, JJ., concur.