**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Richard L. THOMPSON,**
**Defendant-Appellant.**

**No. 85–2378.**

United States Court of Appeals,
Seventh Circuit.

Argued June 6, 1986.

Decided Dec. 3, 1986.

Lee T. Lawless, Asst. Federal Public Defender, St. Louis, Mo., for defendant-appellant.

Laura J. Jones, Asst. U.S. Atty., Benton, Ill., for plaintiff-appellee.

Before POSNER and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

The primary questions presented in this appeal from the defendant's conviction for the use of a dangerous weapon to assault a correctional officer in violation of 18 U.S.C. § 111 are whether (1) the government presented sufficient evidence to convict; (2) a weapon was properly admitted into evidence; (3) the district court properly restricted the defendant's cross-examination of a government witness; and (4) voir dire was properly conducted. For the reasons stated below, we will affirm the judgment of conviction.

## I

Viewing all of the evidence, and all of the reasonable inferences that can be drawn from the evidence, in the light most favorable to the government, *see United States v. Herrera*, 757 F.2d 144, 149 (7th Cir. 1985), we may summarize the testimony presented at trial as follows:

On July 17, 1983, Correctional Officer Richard K. Haynes was assaulted and stabbed 17 times in the vestibule of E–Unit at the United States Penitentiary at Marion, Illinois ("USP–Marion"). Defendant Richard L. Thompson, an inmate who had been previously convicted of assault with intent to commit rape, first-degree murder, assault on a sheriff, and attempted escape, was indicted for the attack. Another inmate, Andrew Ingram, was charged with aiding and abetting Thompson.

E–Unit at USP–Marion contains four tiers, or ranges, of cells designated A, B, C, and D. Each tier houses 18 individual cells, for a total of 72, approximately 60 of which were occupied in July of 1983. The C Tier is located directly above the A Tier and the D Tier above the B Tier. The A and C tiers are separated from B and D Tiers. To enter E–Unit, one first arrives at a stairway landing off the main hall of the prison and must take the stairs on the right to reach the main floor and the stairs on the left for the upper level. At both ends of the main floor are sliding doors of bars called "grill" doors. One goes through the locked grill doors to pass between the A–C side and the B–D side of E–Unit; one can move back and forth between the A and C Tiers or the B and D tiers by means of a stairway.

On July 17, 1983, Clarence Funkhouser, a correctional counseler at USP–Marion, was passing out mail near the institution's dining hall. At about 11:45 a.m., inmate Thompson, as he was leaving the hall to go back to his cell, approached Funkhouser and asked "what was going on." Funkhouser stated that he "didn't know of any-

thing going on," to which (according to Funkhouser) Thompson replied "well we had a lot of paranoid Blacks and Whites and if they didn't find out what was going on, they [sic] could be a lot of people hurt and it could have been officers." Funkhouser immediately relayed the statement to his superior.[1]

On July 17, 1983 (the day of the attack), a "shakedown" of the entire prison was conducted, pursuant to which the inmates were removed from their cells and a search of those cells was performed before the inmates were allowed to return. E–Unit was searched between 4:00 p.m. and 5:20 p.m. Knives were found in the area and certain prisoners were disciplined as a result of the seizure of these weapons.

At the time of the attack (approximately 7:30 p.m.), three officers were working in E–Unit: Haynes (the victim), Woodland Cover, and Clarence Hogan. Haynes was operating the grill door on the A Tier and was supervising the movement of prisoners returning from the dining hall. He had just opened the grill door to let an inmate pass through when he was attacked, and the grill door remained open during the assault. Haynes was stabbed 17 times.

Haynes had an unfocused recollection of the incident, and remembered only one black assailant, but could not identify the individual. Officer Cover, however, who was at a distance of 10 to 12 feet from Haynes, identified Thompson and Ingram as the assailants. Cover saw a weapon in the defendant's hand. He could not see Ingram's hand, but testified that Ingram was making thrusting movements. Cover sounded an alarm soon after the attack began.

Officer Hogan also identified Thompson as one of the two assailants who stabbed Haynes. According to Hogan, there were no other inmates in the area during the attack. The officer tried to intervene in the attack and was himself struck by Thompson. He was then face to face with the inmate, who called the officer "a son of a bitch." Hogan recognized the voice as that of Thompson.

After the assault, Thompson and Ingram ran through the open grill door onto the A Tier. They were later found in their cells on the C Tier. Thompson was housed in Cell 7 and Ingram in Cell 2. The cells on the C Tier were accessible to inmates on the A Tier by means of a stairway.

The prison officials conducted a search of E–Unit after the attack. A cardboard knife sheath was found at the bottom of the stairs in the vestibule where Haynes was assaulted. A sheet with moist blood stains was recovered under the stairs near the grill door on the A Tier. Officers discovered a homemade knife and a bloody wash cloth in the laundry can of the shower room of the C Tier. In the first cell on that tier, which was next to Ingram's cell and unoccupied at the time, another bloody wash cloth was found. In the third cell, which was also unoccupied, another homemade knife was discovered. Both knives were made from stainless-steel ladle handles. Ingram's cell was searched and bloody tennis shoes and a bloody sock were found. A search of Thompson's cell revealed another homemade knife made from a metal shelf bracket.

Thompson was charged in Count 1 of an indictment with using a dangerous weapon to assault a correctional officer in violation of 18 U.S.C. § 111 and in Count 2 with conveying a weapon inside a prison in violation of 18 U.S.C. § 1792.[2] Ingram was

---

**1.** On cross-examination by counsel for Thompson, Funkhouser was asked whether he viewed the inmate's statement as a threat, to which Funkhouser replied "No, I didn't *directly against me*, I didn't" (emphasis added). Thompson's claim, then, that Funkhouser didn't view these remarks as a threat to anyone is not supported by the evidence. The implication of the testimony was that Funkhouser may not have considered himself directly implicated, but none-

theless found Thompson's declaration to be a generalized threat against other prison personnel.

**2.** 18 U.S.C. § 111 provides:

Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in [18 U.S.C. § 1114] while engaged in or on account of the performance of his official duties, shall be fined not more

charged with aiding and abetting Thompson in the assault. The two men were tried together in a four-day jury trial. Thompson was found guilty of Count 1 and sentenced to ten-years imprisonment. Count 2 was dismissed. Ingram was found not guilty. This appeal followed.

## II

### A. Sufficiency of the Evidence

■ The government produced two witnesses at trial, Officers Cover and Hogan, who positively identified Thompson as one of the assailants of Haynes. On appeal, Thompson argues that the district court should have granted his motion for acquittal at the close of all the evidence on the ground that some of the statements made by the prosecution's witnesses varied to the point that their testimony was incredible and thus that the case should not have gone to the jury. We disagree.

There were discrepancies in the testimony of Cover and Hogan. Both, however, were certain that Thompson was one of the attackers. Hogan recognized Thompson's voice and had seen him 15 to 20 times before the attack. Cover had known the defendant for three or four years and had seen him on approximately 50 previous occasions. It is not surprising that a witness to a specific incident might accurately recall the face or voice, but not the clothing or precise location, of a person present at the incident with whom the witness is already familiar. This is obviously true because the witness has almost certainly viewed the other person's face and heard his voice during every prior encounter, and the witness naturally focuses his attention on these features in observing and communicating with that individual. The visage also dominates other attributes, as it is considered the embodiment of the personality, and thus makes a stronger impression

at each encounter relative to other aspects of a person's physical makeup. Furthermore, clothing and location change from meeting to meeting, while the face and voice remain relatively constant; thus, the memory of the latter two features becomes more effectively reinforced in comparison to that of the former two. Similarly, in describing the incident in question, the witness might inadvertently recall clothing that the other person wore during a prior encounter. It is not surprising then that the clothing and location of the assailants, along with other details, did not in the heat of the moment become fixed in the memories of Cover and Hogan.

On the record before us, we can in no way conclude that Thompson was entitled to a judgment of acquittal as a matter of law. The case, therefore, was properly submitted to the jury. The jury could quite reasonably conclude that the discrepancies in the testimony of Cover and Hogan were more consistent with the passage of time and with distortions in perception resulting from the frantic circumstances surrounding the attack on Haynes than with fabrication. One would expect the witnesses to this knife attack to focus primarily on the "threatening" aspects of the attackers, such as the face and hands. We also note that their testimony was consistent with other independent evidence supporting the conclusion that Thompson was the attacker. Furthermore, if Thompson is disturbed by inconsistencies of the government's witnesses, his own witnesses certainly fared no better, for the descriptions they gave of the incident were wildly divergent. Viewing then, as we must, the evidence in the light most favorable to the government, *Herrera,* 757 F.2d at 149, we perceive no ground for overturning the connection for lack of proof.

than $5,000 or imprisoned not more than three years, or both.
Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

18 U.S.C. § 1114 refers to "any officer or employee of any United States penal or correctional institution."

## B. Admission of Homemade Knife

■ Prior to trial, Thompson moved *in limine* to exclude from the evidence the homemade knife constructed from a shelf bracket that was recovered in his cell after the attack. Thompson maintained that there was no proof that this knife was used in the assault and that its admission would be unduly prejudicial. The motion was denied and the knife was received into evidence at trial. Thompson argues on appeal that the admission calls for the reversal of his conviction. We disagree.

Despite Thompson's assertion to the contrary, the proof at trial does not completely rule out the possibility that the knife found in Thompson's cell was used in the attack on Haynes, although it is more likely that the other two knives were used. Assuming *arguendo*, however, that the knife was not used to stab Haynes, it was nonetheless highly probative on the questions of opportunity and preparation, *see* Fed.R.Evid. 404(b), especially in view of the shakedown of E–Unit that occurred earlier in the day. Thompson himself admitted that the knife was his weapon and that he had hidden it in his cell the night before because, in his words, "there was a high level of racial tension within the prison." For these reasons, we find that the admission of the knife was not error.

## C. Limitation of Cross-Examination

■ In cross-examining officer Hogan, counsel for Thompson attempted to ask the witness whether he was aware that Thompson had complained to the prison chaplain about Hogan's connection with the Aryan Brotherhood, which apparently advocates "white supremacy." The district court sustained the government's objection to this line of questioning. At the sidebar conference that followed, Thompson's counsel stated that he sought to show bias on the part of Hogan, but pursued the matter of the Aryna Brotherhood no further. When Thompson later took the stand, he stated that, prior to the attack, he had gone to the prison chaplain due to his "concern of Officer Hogan passing out Ku Klux Klan to White prisoners." The court sustained the government's objection to these statements

and instructed the jury to disregard the statement.

On appeal, Thompson argues that the cross-examination of Officer Hogan was unconstitutionally restricted. Citing *Delaware v. Van Arsdall*, —— U.S. ——, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986), and *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974), Thompson claims he had a right under the Sixth Amendment to demonstrate that a key government witness was possibly biased and that this witness harbored a motive for fabricating the identification of Thompson. The basis for this bias, according to the appellant's opening brief, is that "prior to the assault, [Thompson] had complained to an institutional minister ... about having observed Hogan distributing literature connected with the Ku Klux Klan."

There is no question that the defendant has a right to cross-examine the prosecution's witnesses. However, the defendant must present his position in a clear fashion so as to apprise the trial court of the nature of the testimony he would hope to elicit. When Hogan was on the stand, counsel for Thompson asked questions relating to Hogan's *affiliation* with the Aryan Brotherhood. There was no mention at that time of the Ku Klux Klan or that Hogan was passing out white supremacist literature. The Ku Klux Klan was mentioned only when Thompson was testifying and at that point his counsel made no attempt in the proceedings to tie this statement up with the earlier questions to Hogan concerning the Aryan Brotherhood. In view of the failure to inform the district court as to the nature of the desired cross-examination, we find that Thompson waived any argument he may have had for questioning Hogan about complaints made regarding Hogan's alleged distribution of Ku Klux Klan literature.

## D. Voir Dire

■ Thompson contends that the district court failed to conduct an adequate voir dire. We perceive no merit to this argument whatsoever. The court questioned the venire about a wide range of subjects, including their ability both to afford

Thompson the presumption of innocence and to require proof beyond a reasonable doubt. The questioning was extensive and thorough. The court is not required to ask any particular questions proposed by counsel, *United States v. Verkuilen*, 690 F.2d 648, 660 (7th Cir.1982), and is accorded broad discretion in conducting the voir dire. *Ham v. South Carolina*, 409 U.S. 524, 528, 93 S.Ct. 848, 851, 35 L.Ed.2d 46 (1973). As a general matter, voir dire (absent special circumstances not present here) need only provide "some basis for a reasonably knowledgeable exercise of the right of challenge whether for cause or peremptory." *United States v. Jackson*, 542 F.2d 403, 413 (7th Cir.1976); *see also United States v. Hasting*, 739 F.2d 1269, 1273 (7th Cir. 1984), *cert. denied*, 469 U.S. 1218, 105 S.Ct. 1199, 1200, 84 L.Ed.2d 343 (1985); *Fietzer v. Ford Motor Co.*, 622 F.2d 281, 284 (7th Cir.1980). There was no deficiency in the questions posed in the instant case, for they clearly permitted the knowledgeable exercise of such challenges.

### III

For the reasons stated above, the judgment of conviction is AFFIRMED.