THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MONICO CAMPOS, Defendant-Appellant.

First District (6th Division)   No. 1—89—1143

Opinion filed February 28, 1992.—Rehearing denied April 10, 1992.

438

Randolph N. Stone, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

Clarke D. Forsythe and Kevin J. Tood, both of Americans United for Life, of Chicago for amici curiae.

JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant, Monico Campos, was found guilty of first degree murder of his wife, Victoria Campos, and intentional homicide of an unborn child, and was sentenced to concurrent prison terms of 35 years for each offense. Using a .22 caliber "pen gun," defendant shot his wife, who was approximately 20½ weeks pregnant.

On appeal, defendant contends that the following matters constitute reversible error: (1) the trial court's revision of the issue instructions rendered to the jury on each offense; (2) refusal to query potential jurors during voir dire with questions posed by defense counsel to elicit their beliefs about fetal life; (3) the refusal to admit into evidence the attending physician's medical records and the fetal death certificate; (4) improper impeachment of defendant; (5) improper prosecutorial remarks during closing arguments; (6) refusal to question a potential juror to ascertain whether she was pregnant; (7) ineffective assistance of counsel because of certain remarks made by defense counsel during closing argument; (8) improper expert testimony concerning the cause of death of the fetus; (9) gross prosecutorial miscon-

duct; (10) inappropriate reference to defendant's use of an illegal weapon; and (11) failure to prove the elements of criminal agency to support the conviction of intentional homicide of an unborn child.

In addition, defendant challenges the constitutionality of the intentional homicide of an unborn child and first degree murder statutes, and whether he was improperly convicted of a greater and lesser included offense as the result of a single act.

The shooting occurred at about 6:30 p.m. on December 31, 1987, in the apartment of Theresa Espinoza, the deceased's mother. Defendant and the deceased, who lived in Cicero, were visiting at the time. After the offense, defendant attempted to flee, but was held for the police by a neighbor and family members.

The facts behind the shooting are as follows. The deceased met defendant, a restaurant busboy, in April 1987, and they began living together shortly thereafter. She became pregnant during the summer, and they married in October 1987.

The deceased had previously been married to Demetrius Dimoulas, with whom she had a daughter, age five at the time of trial. After divorcing Dimoulas, the deceased met David Briones and lived with him from 1985 through November 1986. Shortly before the deceased gave birth to his child, another daughter, Briones left the deceased. Briones was a migrant worker and left the Chicago area to harvest crops in other States.

Briones and the deceased remained on friendly terms after the end of their relationship, and he occasionally visited his daughter in Chicago. On December 17, 1987, Briones arrived in Chicago. He stayed at the apartment of the deceased's mother. During this time, the mother arranged for Briones to see his daughter at her apartment several times.

On December 31, 1987, the family and Briones were at the mother's apartment. The mother noticed that defendant was very moody and pouting, apparently because of Briones' presence. The mother saw defendant enter the kitchen with both hands in his jacket pocket. After the deceased came into the kitchen, the mother left the room to get dressed for a party. Moments later, defendant shot and killed the deceased.

Defendant testified that on the afternoon of the offense, he telephoned the mother's apartment from work, and Briones answered. Briones told defendant that the deceased and her mother were at the laundromat. After work, defendant went to the mother's apartment, and the women arrived from the laundromat shortly thereafter.

Later, the deceased entered the kitchen briefly and asked defendant if he would take her father to a tavern. When the deceased entered the room again, defendant asked to speak to her. The deceased told defendant that she had nothing to say to him. Defendant asked the deceased whether she planned to go away with Briones. The deceased replied that she was going away with Briones because she loved him, and that she never loved defendant. Defendant became very upset, took the gun from his rear pocket, and shot it to scare her. He was approximately three meters from the deceased when he fired the gun. Defendant stated that he did not intend to shoot the deceased, but he was nervous and jealous. He aimed the gun towards the wall.

With regard to the medical evidence, the deceased was taken to Mount Sinai Hospital, where she remained alive for eight days. Dr. Stephen R. Meyers, director of fetal medicine at the hospital, testified that he was the deceased's primary attending physician from January 4, 1988, until the time of her death. The deceased's condition was consistent with the clinical diagnosis of brain death, and she was in a significant coma. Dr. Meyers noted a small hole under the decedent's cheekbone, which he found indicative of the gunshot wound which she had sustained. The deceased was attached to several life-support systems.

Dr. Meyers' ultrasound examination revealed that the deceased was pregnant with an alive, normal fetus at 21 to 22 weeks gestation. The deceased's condition remained stable until January 8, at which time her blood pressure became unstable. Dr. Meyers increased the ventilator settings in an attempt to maintain normal oxygenation. Dr. Meyers remained at the deceased's bedside from 8 a.m. until 11:30 a.m., during which time the fetus was alive and its heartbeat normal. Later that morning, the deceased went into shock. Attempts were made to resuscitate the deceased and normalize her blood pressure. However, at approximately 1:30 p.m., the deceased gave birth to a stillborn child that was found between her legs following what the doctors characterized as a "spontaneous delivery." Later that evening, the deceased's heart and lungs stopped functioning, and she was pronounced dead.

Dr. Robert Stein, chief medical examiner for Cook County, performed autopsies on the bodies of the deceased and the fetus on January 9, 1988. Dr. Stein concluded that the bullet entered the deceased through her right cheek, tracked from right to left perforating both cerebral hemispheres, and was retrieved in the back occipital area of the brain.

Although Dr. Stein did not review the medical records that were completed at Mount Sinai Hospital or speak to Dr. Meyers, he opined that the gunshot wound to the head caused the death of the deceased. Dr. Stein's examination of the fetus revealed that it was perfectly normal, and that the cause of death was intrauterine asphyxia, defined as lack of oxygen to the fetus. Dr. Stein testified that the cause of death of the fetus was also the gunshot wound to the head of the deceased. Although the life-support system was sufficient to sustain the deceased's life, it did not provide an adequate supply of oxygen through the placenta to keep the fetus alive. Dr. Stein further explained that the fetal death certificate and the autopsy protocol did not include a provision for manner of death; however, he would have indicated homicide if able to do so on the forms.

In addition to the charge of first degree murder and intentional homicide of an unborn child, the trial court, over the State's objection, instructed the jury on the lesser included offenses of second degree murder of the deceased, voluntary manslaughter of an unborn child, and involuntary manslaughter of each victim. There are no Illinois Pattern Jury Instructions (IPI) for the intentional homicide of an unborn child.

The State's proffered jury instructions comported with the requirements set forth in *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, and instructed the jury that the State had to first establish the mental state necessary for intentional homicide, and then prove beyond a reasonable doubt that defendant did not act under a sudden and intense passion in order to sustain a charge of intentional homicide rather than voluntary manslaughter of an unborn child. The jury returned a verdict of guilty of first degree murder of the deceased and intentional homicide of an unborn child.

On appeal, defendant first contends that the issue instructions misdirected the jury that it could return verdicts of guilty of first or second degree murder, and verdicts of guilty of intentional homicide or voluntary manslaughter of an unborn child, without deliberating on the lesser offenses of involuntary manslaughter for each victim. The instruction at issue provides in relevant part:

> "If you decide from your consideration of all the evidence that the State has proved beyond a reasonable doubt this additional proposition [defendant did not act under a sudden and intense passion resulting from serious provocation by some other person he endeavors to kill but negligently or accidentally kills the unborn child], you should find the defendant guilty of intentional homicide of an unborn child.

If you find from your consideration of all the evidence that the State has not proved beyond a reasonable doubt this additional proposition, you should find the defendant guilty of voluntary manslaughter of an unborn child."

The instructions are similarly phrased for the first degree versus second degree murder of the deceased. Defendant maintains that the instructions specifically misdirected the jury that it could return a guilty verdict of intentional homicide of an unborn child if the State negated the provocation-voluntary manslaughter theory, without making any reference to evidence regarding the theory of involuntary manslaughter. In essence, defendant argues that if the jury found defendant guilty, the issue instructions direct the jury to choose only between the two most serious offenses, without taking into consideration the less serious alternative of involuntary manslaughter.

In order to assess the propriety of a particular jury instruction, it must be viewed in conjunction with all of the instructions given; thus, it is sufficient if the series of instructions in their entirety fully and fairly announce the applicable law. (*People v. Hartfield* (1985), 137 Ill. App. 3d 679, 484 N.E.2d 1136, citing *People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746.) Moreover, any confusion or ambiguity in an instruction may be cleared up by another instruction, as no single instruction is required to set forth all relevant law on a single subject. *People v. Morrison* (1985), 138 Ill. App. 3d 595, 486 N.E.2d 345.

■ While we acknowledge that the jury instructions in this case may appear complicated, we find nonetheless that the instructions, viewed as a whole, were a correct statement of the law and adequately informed the jury of the nature of the charges against defendant, including involuntary manslaughter. In both the preliminary and concluding instructions, the trial judge informed the jury that defendant was charged with three offenses, which included involuntary manslaughter of each victim. Immediately following the giving of IPI Criminal 2d No. 704A (1989 Supp.), for first and second degree murder, the trial judge instructed the jury pursuant to IPI Criminal 2d Nos. 7.07 and 7.08 of the definition of involuntary manslaughter, and the mental state required to show that an act was committed with recklessness. Finally, the jury was provided with four verdict forms for each victim, which allowed the jury to find: (1) not guilty of any offense; (2) guilty of first degree murder (intentional homicide of an unborn child); (3) guilty of second degree murder (voluntary homicide of an unborn child); and (4) guilty of involuntary manslaughter (involuntary manslaughter of an unborn child). Thus, it cannot be said that if a finding of involuntary manslaughter was borne out by the evi-

dence, the jury was not adequately informed that it could find defendant guilty of that offense.

▆ Defendant also objects to the trial court's use of a non-IPI instruction for the intentional homicide and voluntary manslaughter of an unborn child offenses. The intentional homicide of an unborn child statute replaced the previous feticide statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1.1 (repealed by Pub. Act 84—1414 §2, eff. Sept. 19, 1986; Pub. Act 85—293, art. II §21, eff. Sept. 8, 1987)), and was enacted shortly before the commission of this offense. As previously noted, there are no IPI instructions for the intentional homicide of an unborn child offense. However, defendant's proffered instructions for this offense did not conform to the requirements of *Reddick*, which requires the State to disprove provocation in order to sustain the charge of intentional homicide of an unborn child. The State's proposed instructions correctly incorporated this additional proposition, and were, therefore, properly tendered to the jury.

Defendant next assigns as error the trial court's refusal to ask prospective jurors certain questions designed to probe their bias and experiences on the issue of fetal life and abortion. The questions requested are as follows:

"1) Do you believe that a fetus in the womb is a living being, separate and apart from the mother?

2) Do you believe that it is a sin or immoral to have an abortion?

3) Do you know anyone personally who has had an abortion?"

Instead of asking these specific questions to potential jurors, the trial court posed the following question: "Do you believe that the taking of the life of an unborn child is a crime or wrong in all instances?"

▆ Defendant's reliance upon *People v. Murawski* (1954), 2 Ill. 2d 143, 117 N.E.2d 88, for the proposition that defendant should have been allowed to ascertain whether prospective jurors harbored potential bias about abortion or fetal life is misplaced. In that case, the supreme court found that it was error for the trial court to have refused to ask the following question to potential jurors during *voir dire*: "Are you of the opinion that an abortion should never be performed?" (2 Ill. 2d at 147.) In *Murawski*, however, defendant was charged with abortion and other related offenses. In this case, defendant's attempts to determine potential jurors' perspectives about abortion are irrelevant. Defendant was charged with intentional homicide of an unborn child and not with committing abortion or any related crime. Failure to ask the aforementioned

questions during *voir dire* did not compromise defendant's right to an impartial jury.

Defendant next contends that the trial court improperly refused to admit Dr. Meyers' medical records into evidence. Dr. Meyers testified as to the medical condition of the deceased and her unborn child. Dr. Meyers stated that he had reviewed the medical records compiled prior to his involvement and concurred with the diagnosis of brain death. Defendant thereupon moved to admit the medical records into evidence. Initially, the trial court granted defendant's motion but later reconsidered and refused to admit the records.

■ There are two steps required for the admission of medical records. The custodian of the records must verify that the records were kept in the ordinary course of business and are in the same condition as when made. The records also must be verified by the testimony of the persons who made the entries. (See *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.) These requirements were not complied with in the present case, and the trial court properly refused to allow the medical records into evidence.

We next address defendant's contention that the fetal death certificate prepared by Dr. Stein was also improperly excluded from evidence. Defendant correctly asserts that public records, such as the fetal death certificate prepared by Dr. Stein in his capacity as chief medical examiner of Cook County, are admissible in any criminal action as *prima facie* evidence of the facts, findings, opinions, diagnoses and conditions stated therein. Ill. Rev. Stat. 1987, ch. 38, par. 115—5.1.

■ The record, however, shows that the trial judge reconsidered his ruling only as it pertained to the medical records, and that the death certificate remained admissible in evidence. The record is devoid of any reference that the trial judge intended to exclude the fetal death certificate; rather, the only context in which it is discussed is that it was considered at the same time the trial judge first found the medical records to be admissible. We do not believe that the trial judge excluded the fetal death certificate from admission into evidence. In any event, in view of Dr. Stein's testimony, defendant suffered no prejudice.

Defendant also maintains that the State's attempts to impeach defendant's testimony were prejudicial and improper because the cross-examination consisted of unsupported insinuations. The questions at issue included a threat made by defendant to kill the deceased and Briones, and requests made by defendant to other family members to leave him and the deceased alone in the kitchen on the evening in question. Defendant denied that he had made such a threat or requests. The

State did not produce any witnesses to perfect the attempted impeachment.

■ We note, however, that defense counsel did not object to the failure of the State to perfect impeachment at trial, nor was the issue raised in defendant's motion for a new trial. In view of the well-settled principle that in order to preserve an issue for appeal, defendant must raise that issue by objecting at trial and by including the matter in a written post-trial motion, we find that defendant has waived this argument for purposes of review. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

■ Defendant further assigns as reversible error inflammatory remarks made by the State during closing arguments. In particular, defense counsel complains that the State improperly "play-acted" a hypothetical conversation between the deceased and defendant moments before she was killed; that the prosecutor purported to "speak for the deceased"; and that the effect of the defense advanced would declare "open season" on spouses. Defense counsel, however, failed to object to these remarks at trial and, thus, they are not properly before us for review. Defendant's failure to object at trial waives any error in the proceedings absent a showing of plain error. *People v. Nevitt* (1990), 135 Ill. 2d 423, 553 N.E.2d 368.

■ The State did make certain other comments that were objected to by defense counsel, including the statement that, "[a]fter 14 months he can say what he wants up there about that night," and that the jury had the unique opportunity to hear a murderer take the stand and recount his version of the events. However, this court has consistently held that a prosecutor is allowed considerable latitude in closing argument as long as the comments are based on the evidence or reasonable inferences therefrom. (*People v. Evans* (1988), 173 Ill. App. 3d 186, 527 N.E.2d 448; *People v. Williams* (1986), 146 Ill. App. 3d 767, 497 N.E.2d 377; *People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929.) Improper remarks do not warrant reversal unless they are so prejudicial as to constitute a material factor in defendant's conviction (*People v. Merideth* (1987), 152 Ill. App. 3d 304, 503 N.E.2d 1132), or otherwise deny defendant a fair trial. (*People v. Branch* (1987), 158 Ill. App. 3d 338, 511 N.E.2d 872.) We find that the remarks objected to were fair inferences based upon the evidence and did not deprive defendant of a fair trial.

Defendant also contends that the State misstated the law in its closing arguments concerning the offense of involuntary manslaughter. Specifically, the State commented that, "simply put, involuntary manslaughter is that it was an accident—he didn't intend it at all." The State's attempt to provide a definition of involuntary manslaughter was inter-

rupted, and the trial judge cautioned that he would instruct the jury as to the relevant law.

■■ Upon review of the record, we find that any impropriety in the State's reference to the law of involuntary manslaughter was adequately corrected by the trial judge's timely and repeated directions that he would provide instructions on the law and that the jury should follow the law as presented by the court. The court provided proper jury instructions on the elements of involuntary manslaughter, including the requisite mental state of recklessness required for that offense. Where the trial court properly instructs the jury on the law, prosecutorial argument which misstates the law does not constitute reversible error. *People v. Maloney* (1990), 201 Ill. App. 3d 599, 558 N.E.2d 1277.

Defendant also contends that the trial court improperly refused during *voir dire* to ask follow-up questions to a juror who appeared to be pregnant. Defendant argues that it was crucial for counsel to ascertain whether or not the juror was pregnant because of the nature of the charges, which involved the murder of a pregnant woman and her unborn child. The trial judge declined to posit that question to the juror because he felt that it was too personal.

The purpose of *voir dire* is to permit counsel and the judge to ascertain whether the minds of prospective jurors are free from bias and prejudice. (*People v. Allen* (1986), 148 Ill. App. 3d 200, 498 N.E.2d 838.) Reversible error will only be found where the trial judge's conduct during *voir dire* amounted to an abuse of discretion and thwarted the selection of an impartial jury. *People v. Allen*, 148 Ill. App. 3d 200, 498 N.E.2d 838; *People v. Teague* (1982), 108 Ill. App. 3d 891, 439 N.E.2d 1066.

■■ The juror in question twice stated during *voir dire* that she did not believe that the taking of the life of an unborn child is a crime or wrong under all circumstances, and that she could follow the principles and instructions of law. She also indicated that she could be fair and impartial to both sides. We find, therefore, that defendant's claim that the juror's possible pregnancy precluded her from functioning as an impartial juror, without any further support, does not rise to the level of an abuse of judicial discretion.

Defendant next argues that he was denied effective assistance because of statements made by defense counsel during closing argument. Defendant contends that defense counsel repeatedly abandoned the request for not-guilty verdicts, and did not make any favorable legal arguments. Defendant particularly objects to the following comments made by defense counsel:

"I'm telling you right now we're not asking for a finding of not guilty. I don't believe the law would support it. I don't believe the facts will support it. And I don't even remember arguing ever in my career of [*sic*] a jury that I'm not asking for a not guilty. But I'm telling you right now lest my motives be questioned that the law does not support a not guilty in this case as to the death of Victoria Campos Espinoza."

Defendant argues that the above concessions of defendant's guilt constituted ineffective assistance of counsel *per se*. In order to establish a *per se* claim of ineffective assistance, defendant must demonstrate that defense counsel entirely failed to subject the prosecution's case to meaningful adversarial testing; thus, prejudice will be presumed and defendant need not satisfy the *Strickland* test. That test requires defendant to prove two elements: (1) that his attorney failed to perform as a reasonably competent attorney, and (2) there exists a reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.

Defendant relies upon *People v. Hattery* (1985), 109 Ill. 2d 449, 488 N.E.2d 513, as support for his position that counsel's concession of defendant's guilt is sufficient to establish proof of *per se* ineffective assistance of counsel. However, this doctrine has evolved from simply a concession by defense counsel of defendant's guilt to a requirement that defense counsel must have "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." (Emphasis omitted.) (*People v. Johnson* (1989), 128 Ill. 2d 253, 266, 538 N.E.2d 1118.) In *Johnson*, our supreme court stated:

"In situations where there is overwhelming evidence of guilt and no defense, if counsel contests all charges he is liable to lose credibility with the trier of fact when it comes to charges where a legitimate defense exists. Though concession of the murder was made, going to trial did preserve for the defendant matters that a guilty plea necessarily would have waived." *Johnson*, 128 Ill. 2d at 270, 538 N.E.2d at 1125.

In *People v. Combs* (1990), 206 Ill. App. 3d 217, 563 N.E.2d 798, this court concluded that a defendant can establish *per se* ineffectiveness of counsel only if the facts establish that defense counsel had failed entirely to subject the prosecution's case to meaningful adversarial testing. If defendant fails to do so, he must satisfy the *Strickland* test by proving that defense counsel's deficiencies prejudiced him so as to deprive him of a fair trial.

■ In view of the fact that defendant shot the deceased in the kitchen of her mother's apartment, with several members of the family in the apartment, that he admitted shooting the gun to frighten her, and that the deceased's brother testified that he saw defendant standing over the body of the deceased with a gun in his hand, we find that the evidence amassed against defendant is indeed overwhelming.

We also find that defendant has failed to establish ineffective assistance of counsel pursuant to the *Strickland* test. In his closing argument, defense counsel attempted to portray defendant as a hard-working individual who loved and supported the deceased and her two children, as well as her father. Throughout the course of the trial, defense counsel consistently advanced the theory that defendant was upset at the prospect of the deceased leaving him for Briones. Finally, defense counsel stated in his closing argument that this case is "not a murder in the first degree. Whether it's murder in the second degree or whether it's involuntary manslaughter is for you to decide." We find, therefore, that defense counsel subjected the State's case to meaningful adversarial testing, thereby negating defendant's contention that he was denied effective assistance of counsel.

Defendant next contends that the admission of expert testimony by Dr. Stein that the fetus died from the gunshot wound to the mother's head was beyond the scope of his expertise. Defendant maintains that Dr. Stein had no knowledge of the life-support systems monitoring the deceased and the fetus, nor any contact with the treating physician or familiarity with the hospital medical records. As such, defendant contends that Dr. Stein was not qualified to voice an opinion on the events which occurred at the hospital and caused the death of the fetus.

■ We believe that Dr. Stein's testimony concerning the cause of death of the fetus as intrauterine asphyxia was proper. Our supreme court has held that an expert witness may testify to an opinion on an ultimate issue in a case. (*People v. Harris* (1989), 132 Ill. 2d 366, 547 N.E.2d 1241.) The rationale behind allowing such expert testimony as to ultimate issues is that the jury is not required to accept the opinion, and its responsibilities are not being usurped. *Merchants National Bank v. Elgin, Joliet & Eastern Ry., Inc.* (1971), 49 Ill. 2d 118, 273 N.E.2d 809; *People v. Price* (1988), 176 Ill. App. 3d 831, 531 N.E.2d 901.

Dr. Stein, a forensic pathologist with 30 years' experience, who also functioned for over 12 years as the chief medical examiner of Cook County, was well qualified to render an opinion as to the cause of death of the fetus. Dr. Stein conducted an autopsy on the deceased, and was aware of the fact that she had sustained a gunshot wound to her face,

and that she had been on a life-support system. We believe that these facts justified his giving an opinion as to the fetus' death.

Defendant next maintains that the State engaged in gross misconduct at trial by requesting the surviving members of the deceased's family to describe in detail the personal attributes of the deceased and the effect of the family's loss. Specifically, defendant complains that testimony was elicited at trial from the deceased's mother in which she described the deceased as a "happy-go-lucky person," that she was "always happy" and that they had a close relationship and confided in each other. However, defendant only objected on the basis that the testimony was narrative. Because objections at trial on specific grounds waive all other grounds of objection (*People v. Barrios* (1986), 114 Ill. 2d 265, 500 N.E.2d 415; *People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601), defendant has waived the right to object on the grounds he now asserts on appeal.

Defendant also complains that during closing arguments, the prosecutor mentioned that the deceased's two little girls had lost their mother and that now they were being raised by their grandmother. In addition, the State prior to closing arguments displayed before the jury a family photograph of the deceased accompanied by her two children. Defendant argues that the State's blatant and repeated appeals to the jury's sympathy for the deceased's family were highly improper and that defendant's convictions should be reversed and remanded for a new trial.

Defendant correctly cites *People v. Hope* (1986), 116 Ill. 2d 265, 508 N.E.2d 202, as support for his position that evidence that a murder victim left a spouse and family has no relationship to guilt or innocence of an accused, but normally serves only to prejudice defendant in the eyes of the jury. However, the *Hope* court also emphasized that not every mention of a murder victim's family *per se* entitles defendant to a new trial; such statements can be harmless, depending upon how the evidence is introduced.

Evidence concerning the deceased's family is admissible to the extent that it is "necessarily involved in the proper presentation of the State's case." (*People v. Barrow* (1989), 133 Ill. 2d 226, 272, 549 N.E.2d 240.) Due to the circumstances of this case, wherein the deceased was shot at her mother's apartment in close proximity to her two small children and her brother, some reference to the victim's family during the trial was not only proper, but virtually inevitable. (*People v. Simms* (1988), 121 Ill. 2d 259, 520 N.E.2d 308.) The trial judge also recognized the impropriety of allowing a family photograph to remain within the purview of the jury and admonished the State not to show it to the jury and to turn it facedown on its counsel table. We find, therefore, that any

reference to the loss experienced by the deceased's family was harmless under the circumstances.

Defendant further contends that evidence of the illegality of the pen gun was prejudicial error because it was collateral to the crimes charged. Although evidence which tends to show that an accused has committed crimes or acts of misconduct which are distinct and entirely unrelated to the one for which he is being tried is both incompetent and prejudicial (*People v. Paull* (1988), 176 Ill. App. 3d 960, 531 N.E.2d 1008), erroneous admission of evidence of other crimes, wrongs or acts does not constitute *per se* grounds for reversal where evidence of defendant's guilt is demonstrated beyond a reasonable doubt. *People v. Scott* (1990), 194 Ill. App. 3d 634, 551 N.E.2d 288; *People v. Foster* (1989), 190 Ill. App. 3d 1018, 547 N.E.2d 478.

While defendant was not charged with unlawful use of weapons, it is undisputed that the pen gun was the weapon used in the commission of the offense. Consequently, certain references to the fact that defendant possessed the gun, and the mechanics of this particular weapon, were unavoidable under the circumstances. Moreover, during the State's cross-examination of defendant, defense counsel first posed and later withdrew an objection to the State's question as to whether defendant was aware of the illegality of the gun. Thus, we believe that any reference to the pen gun, in view of defense counsel's tactical strategy to concede its illegality, was harmless.

Defendant next asserts that the State failed to prove the element of criminal agency necessary to support a conviction for intentional homicide of an unborn child, where the fetus died during a "spontaneous abortion" which did not exclude unknown causes of death. Defendant maintains that the failure of such proof requires the reversal of the conviction. Alternatively, defendant argues that because the homicidal death of the fetus was a factor expressly influencing the judge's sentencing determination on both charges, his case should be remanded for resentencing on the remaining conviction.

The State's burden is not to prove that the defendant's act is the sole and immediate cause of death, but that the defendant's act was, beyond a reasonable doubt, a contributing cause to a death such that the death did not result from a source unconnected with the defendant's act. (*People v. Carter* (1988), 168 Ill. App. 3d 237, 522 N.E.2d 653; *People v. Brown* (1978), 57 Ill. App. 3d 528, 373 N.E.2d 459.) Extensive medical testimony is not always necessary to show this causal relationship between death and the act of the defendant. (*People v. Jones* (1961), 22 Ill. 2d 592, 177 N.E.2d 112.) The existence of a time interval between the

defendant's act and death does not preclude such a causal link. *People v. Hughes* (1977), 46 Ill. App. 3d 490, 360 N.E.2d 1363.

██ It is uncontroverted that the bullet defendant fired at the deceased did not cause an immediate injury to the fetus. However, it is reasonable to infer that such a trauma, which left the deceased in a significant coma and attached to several life-support systems to monitor her vital signs, would ultimately affect the life of the unborn child. Dr. Stein testified that the cause of death of the fetus was the gunshot wound to the head of the deceased, which caused intrauterine asphyxia. Dr. Stein also opined that while the life-support system was sufficient to sustain the deceased's life, it did not provide an adequate supply of oxygen through the placenta to keep the fetus alive.

In the present case, the State has established a sufficient causal link to connect defendant's act to the death of the fetus. When the facts engender such an obvious association between the act and death that the connection is easily understood from common knowledge and experience, no strenuous technical explanations are required by the law as adequate proof. (*People v. Carter*, 168 Ill. App. 3d 237, 522 N.E.2d 653; *People v. Jones*, 22 Ill. 2d 592, 177 N.E.2d 112; *People v. Brown*, 57 Ill. App. 3d 528, 373 N.E.2d 459.) After determining that criminal agency has been properly established, we need not address defendant's alternate argument requesting remand for resentencing on the intentional homicide of an unborn child conviction.

Defendant's next argument, a challenge to the constitutionality of the intentional homicide of an unborn child statute, has been rejected by this court. *People v. Ford* (1991), 221 Ill. App. 3d 354, 581 N.E.2d 1189.

In *Ford*, the defendant was found to have stomped or kicked the stomach of his 17-year-old stepdaughter who was 5½ months pregnant, thereby causing the death of her unborn child. Similar to the issues raised in the present case, the defendant there claimed that the fetal homicide statute violated the equal protection clause because it failed to distinguish between viable and nonviable fetuses, and whether a valid legislative purpose existed for protecting the potentiality of human life.

██ After first distinguishing between a woman who chooses to terminate her pregnancy, as opposed to a defendant who assaults a pregnant woman which causes the death of her fetus, the *Ford* court held that they are not similarly situated. The statute simply protects the mother and the unborn child from the intentional wrongdoing of a third party by imposing criminal liability. Moreover, the distinction between an embryo or viable fetus versus a nonviable fetus was found to be immaterial to an equal protection challenge, in view of the State's interest in protecting potential human life. We adhere to the *Ford* ruling, and we

reject the attack on the constitutionality of the intentional homicide of an unborn child statute.

Relatedly, defendant also challenges the constitutionality of the first degree murder statute (Ill. Rev. Stat. 1987, ch. 38, par. 9—1) as violative of due process, equal protection, and separation of powers. However, the first degree murder statute has withstood challenges despite scrutiny on each of the grounds advanced by defendant. See *People v. Jerome* (1990), 206 Ill. App. 3d 428, 564 N.E.2d 221 (requiring defendant charged with first degree murder to prove mitigating factor in order to reduce offense to second degree murder did not violate due process); *People v. Clark* (1991), 207 Ill. App. 3d 439, 565 N.E.2d 1373 (first degree murder statute does not violate equal protection on theory that it requires a defendant to prove second degree murder to escape a presumption of guilt of first degree murder, as there is no presumption of guilt to first degree murder which must be rebutted by defendant); *People v. Gore* (1991), 212 Ill. App. 3d 984, 571 N.E.2d 1041 (homicide scheme did not violate separation-of-powers scheme; no language in statute indicated that prosecutor could not charge defendant with second degree murder).

■ Defendant's final argument asserts that defendant was improperly convicted of a greater and lesser included offense arising from a single physical act. In *People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183, our supreme court determined that the crime of feticide is not a lesser included offense of murder. The court in *Shum* held that since there were two victims involved and feticide is not a lesser included offense of murder, both convictions may stand. Applying the principles set forth in *Shum* to the present case, we find that defendant was properly convicted of both offenses.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN, P.J., and LaPORTA, J., concur.