UNITED STATES of America ex rel.
Monico CAMPOS, Petitioner,

v.

Howard PETERS, Respondent.

No. 92 C 7921.

United States District Court,
N.D. Illinois, E.D.

June 30, 1993.

Emily Eisner, Cook County Public Defender's Office, Chicago, IL, for plaintiff.

Steven J. Zick, Asst. Atty. Gen., Chicago, IL, for defendant.

## *MEMORANDUM OPINION AND ORDER*

ASPEN, District Judge:

Presently before this court is Monico Campos' petition for habeas corpus relief pursuant to 28 U.S.C. § 2254. Campos contends that the use of jury instructions which prevented jurors from considering a finding of involuntary manslaughter, prosecutorial misconduct during closing argument, and the court's failure to determine whether a certain juror was pregnant violated his due process rights. For the following reasons, we deny the petitioner's request for habeas relief.

### I. Factual Background

Following a jury trial, Campos was convicted of the first degree murder of his wife and the intentional homicide of his unborn child, Ill.Rev.Stat. ch. 38, ¶¶ 9–1(a)(1) & 9–1.2. The ensuing facts supporting this conviction are taken from the opinion of the appellate court on direct review and are presumed accurate. 28 U.S.C. § 2254(d) (1988).

The deceased met defendant, a restaurant busboy, in April 1987, and they began living together shortly thereafter. She became pregnant during the summer, and they married in October 1987.

The deceased had previously been married to Demetrius Dimoulas, with whom she had a daughter, age 5 at the time of trial. After divorcing Dimoulas, the deceased met David Briones, and lived with him from 1985 through November 1986. Shortly before the deceased gave birth to his child, another daughter, Briones left the deceased....

Briones and the deceased remained on friendly terms after the end of their relationship, and he occasionally visited his daughter in Chicago. On December 17, 1987, Briones arrived in Chicago. He stayed at the apartment of the deceased's mother. During this time, the mother arranged for Briones to see his daughter at her apartment several times.

On December 31, 1987, the family and Briones were at the mother's apartment. The mother noticed that defendant was very moody and pouting, apparently because of Briones's [sic] presence. The mother saw defendant enter the kitchen with both hands in his jacket pocket. After the deceased came into the kitchen, the mother left the room to get dressed for a party. Moments later, defendant shot and killed the deceased.

Defendant testified that on the afternoon of the offense, he telephoned the mother's

apartment from work, and Briones answered. Briones told defendant that the deceased and her mother were at the laundromat. After work, defendant went to the mother's apartment, and the women arrived from the laundromat shortly thereafter.

Later, the deceased entered the kitchen briefly and asked defendant if he would take her father to a tavern. When the deceased entered the room again, defendant asked to speak to her. The deceased told defendant that she had nothing to say to him. Defendant asked the deceased whether she planned to go away with Briones. The deceased replied that she was going away with Briones because she loved him, and that she never loved defendant. Defendant became very upset, took the gun from his rear pocket, and shot it to scare her. He was approximately three meters from the deceased when he fired the gun. Defendant stated that he did not intend to shoot the deceased, but he was nervous and jealous. He aimed the gun towards the wall.

... [T]he deceased was taken to Mount Sinai Hospital where she remained alive for eight days.... The deceased's condition was consistent with the clinical diagnosis of brain death, and she was in a significant coma.... The deceased's condition remained stable until January 8, at which time her blood pressure became unstable.... Later that morning, the deceased went into shock. Attempts were made to resuscitate the deceased and normalize her blood pressure. However, at approximately 1:30 p.m., the deceased gave birth to a stillborn child that was found between her legs following what doctors characterized as a "spontaneous delivery." Later that evening, the deceased's heart and lungs stopped functioning, and she was pronounced dead....

The court instructed the jury on first degree murder, voluntary manslaughter (also known as second degree murder),[1] and involuntary manslaughter of the deceased, and intentional homicide,[2] voluntary manslaughter and involuntary manslaughter of an unborn child. After deliberation, the jury found the petitioner guilty of first degree murder and intentional homicide.

On appeal, Campos argued, *inter alia*, (1) that the jury instructions erroneously permitted the jury to return verdicts of first or second degree murder without deliberating on the lesser offense of involuntary manslaughter, (2) that the prosecutor's arrogation of the power to "speak" for the victim, his dramatic rendition of what she might have said to Campos before he shot her, and his derision of Campos' right to testify warranted reversal, and (3) that during *voir dire*, the trial court improperly refused to ask a juror, who appeared pregnant, whether she was in fact carrying a child. Rejecting Campos' claims, the appellate court affirmed his conviction. *People v. Campos*, 227 Ill.App.3d 434, 592 N.E.2d 85, 169 Ill.Dec. 598 (First Dist.1992). Subsequently, the Illinois Supreme Court denied Campos' petition for leave to appeal the appellate court's decision. Campos now raises these same issues in his petition.

## II. Discussion

Arguing that the appellate court's decision rests on adequate and independent state law grounds, the state contends that we should not review Campos' petition. If, indeed, the state appellate court's decision "rests on a state law ground that is independent of the federal question and adequate to support the judgement," we have no jurisdiction to address petitioner's claims. *Coleman v. Thompson*, —— U.S. ——, —— – ——, 111 S.Ct. 2546, 2553–54, 115 L.Ed.2d 640 (1991). To discuss Campos' federal claims when the state's decision is based on wholly adequate and independent state procedural rules or interpretations of state law would be to render an advisory opinion, something we are

---

**1.** The court used Illinois Pattern Instruction ("I.P.I.") 7.04A for the first and second degree murder instruction, which conforms to the constitutional requirements set forth in *People v. Reddick*, 123 Ill.2d 184, 526 N.E.2d 141, 146, 122 Ill.Dec. 1, 6 (1988) and *Falconer v. Lane*, 905 F.2d 1129 (7th Cir.1990).

**2.** No I.P.I. exists for the intentional homicide of an unborn child.

not permitted to do. However, such is not the case here.

 To buttress its assertion of adequate and independent state grounds, the state facilely observes that the appellate court relied exclusively on Illinois case law in reaching its decision. However, the mere fact that the state court failed to cite federal case law does not suffice to preclude federal review if Campos raised constitutional claims in his briefs to the appellate court, and if, regardless of the authority cited, the appellate court resolved federal constitutional issues. *See Ake v. Oklahoma,* 470 U.S. 68, 74, 105 S.Ct. 1087, 1092, 84 L.Ed.2d 53 (1985) ("As we have indicated in the past, when resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and our jurisdiction is not precluded.").

 In this case, the petitioner argued to the Illinois appellate court that the jury instructions given by the trial court, the prosecutor's remarks during closing argument, and the court's handling of *voir dire* violated the U.S. Constitution. While the appellate court did not rely on any federal case law in concluding that the jury instructions were proper, that the closing arguments did not deprive petitioner of a fair trial, or in concluding that the *voir dire* did not thwart the selection of an impartial jury, it nonetheless passed upon the substantive issues raised. Accordingly, we have jurisdiction to review Campos' claims.

### A. Jury Instructions

Campos contends that I.P.I. # 7.04A, which covers first and second degree murder, and the non-I.P.I. instruction given for intentional homicide of an unborn child, along with its lesser included offenses, violate the due process clause of the Constitution.[3] Specifically, Campos maintains that the instructions

fail to make reference to the lesser offense of involuntary manslaughter, or to explain how and when that charge should be considered in relation to the more serious offenses of first and second degree murder. As a result of this omission, Campos argues, the instructions misdirect the jury, permitting it to find a defendant guilty of first or second degree murder without considering whether involuntary manslaughter is the more appropriate verdict.

 In determining the constitutionality of a particular jury instruction, a court must view it in the context of all instructions given, since any ambiguity or confusion created by one instruction may be cleared up by another. *Falconer,* 905 F.2d at 1135. For Campos to successfully maintain his constitutional claim here, we must find that the instructions as a whole *inappropriately* steered the jury away from a finding of involuntary manslaughter. That is, we must find that in a situation in which the jury *should* have considered a verdict of involuntary manslaughter, the instructions erroneously directed them away from that alternative. Such is not the case here.

 The jury was told that Campos had been charged with three offenses in connection with each victim, one of which was involuntary manslaughter. The court first instructed the jury on the charges of first and second degree murder, correctly directing that:

> if you find from your consideration of all the evidence that any one of these propositions [required for a finding of intentional homicide] has not been proved beyond a reasonable doubt, you should find the defendant not guilty of first degree murder and your deliberations on this charge should end.

Transcript at p. 688.[4] With this instruction, the court accurately informed the jury that

---

3. In the interest of clarity, we note up front that this is *not* a *Falconer* case—i.e. this petition does not address the interaction of first degree and second degree murder instructions. *See Falconer v. Lane,* 905 F.2d 1129 (7th Cir.1990). Rather, it addresses the interaction of the first and second degree murder instructions with the lesser charge of involuntary manslaughter.

4. The court's instructions on intentional homicide of an unborn child track those for first degree murder. There, the judge stated:

> If you find from your consideration of all the evidence that any one of these propositions [required for the intentional homicide of an unborn child] has not been proved beyond a

(1) all elements of first degree murder must be established beyond a reasonable doubt in order for the jury to return a guilty verdict for either first or second degree murder, and (2) that if it did not find all of the required elements, it should move on from those charges. Given this explanation, the petitioner's reliance on later portions of each instruction loses its force.

Petitioner points out that in the instructions for first and second degree murder, the court gave the following guidance:

> If you find from your consideration of all the evidence that the defendant has proved by a preponderance of the evidence that he is guilty of the lesser offense of second degree murder instead of first degree murder, you should find the defendant guilty of second degree murder.

> If you find from your consideration of all the evidence that the defendant has not proved by a preponderance of the evidence that he is guilty of the lesser offense of second degree murder instead of first degree murder, you should find the defendant guilty of first degree murder

Transcript at p. 689. Petitioner laments that these directions assure that the jury will choose between the verdicts of first and second degree murder without considering the option of involuntary manslaughter. We do not agree. As discussed above, by the time the jury reaches the point where it is choosing between first and second degree murder, it has necessarily found that the state established all elements of first degree murder beyond a reasonable doubt. Accordingly, at this juncture, it is proper for the jury, to choose between first and second degree murder, and it is unnecessary for the court to insert mention of involuntary manslaughter.[5]

Other elements of the instruction bolster our finding. For example, immediately after the court instructed the jury on first and second degree murder, it instructed the jury on the crime of involuntary manslaughter.[6] Transcript at p. 692. When sending the jury off to deliberate, the court again apprised the jury of the charges against Campos, reminding them that he was also charged with involuntary manslaughter. Transcript at p. 703. Finally, the court provided the jury with four verdict forms for each victim, including one for involuntary manslaughter. Taken as a whole, we cannot conclude that I.P.I. # 7.04A or the instructions given for intentional homicide of an unborn child, misdirected the jury and caused them to unconstitutionally neglect the charge of involuntary manslaughter.

## B. Closing Arguments

■ Campos challenges the constitutionality of the prosecutor's closing argument, claiming that the prosecutor's pretense of "speaking" for the victim and his disparagement of Campos' right to testify violated due process. In order to find that a defendant has been denied a fair trial, a prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). Viewing the trial as a whole, we cannot agree with Campos that the prosecutor's comments during closing argument rose to this level.

### (i) "Playacting"

■ Campos first contends that the prosecutor should not have "spoken" for the victim, and that in doing so, he not only inflamed the jury, but fabricated non-existent eyewitness testimony.[7] Although the state

---

reasonable doubt, you should find the defendant not guilty of the intentional homicide of an unborn child and not guilty of voluntary manslaughter of an unborn child and your deliberations on these charges should end. Transcript at p. 697.

**5.** Because the entire instructions for intentional homicide of an unborn child track those for first degree murder, the same analysis applies to petitioner's objections to those instructions.

**6.** Similarly, right after the court instructed the jury on intentional homicide of an unborn child, it gave instructions for involuntary manslaughter of an unborn child. Transcript at p. 700.

**7.** The statements Campos relies upon are these: Prosecutor: "Vicki, we're not going to that party tonight. I don't want you to go." "Monico, it's a family party. It's New Year's Eve. Why don't we just take the kids and go. We'll have fun." "You want to go because David is going." "David is going but I want to

neglected to raise the issue in its answer, Campos procedurally defaulted this claim, since defense counsel did not object to the prosecutor's "playacting" at trial. Under Illinois law, a defendant's failure to object at trial waives any error in the proceedings absent a showing of plain error. *People v. Nevitt*, 135 Ill.2d 423, 553 N.E.2d 368, 142 Ill.Dec. 854 (1990). Accordingly, the appellate court held that the propriety of these remarks were not properly before the court on review. *See People v. Campos*, 227 Ill. App.3d 434, 592 N.E.2d 85, 92, 169 Ill.Dec. 598, 605 (1st Dist.1992). Because Campos has neither offered nor shown any cause or prejudice for his failure to object at trial, he cannot litigate this claim before us now. *Solles v. Israel*, 868 F.2d 242, 250 (7th Cir. 1989), *cert. denied*, 490 U.S. 1101, 109 S.Ct. 2457, 104 L.Ed.2d 1011 (1989), *citing Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *United States ex rel. Kubik v. Welborn*, Slip. Op. No. 92 C 6653, 1993 WL 98235 (N.D.Ill. March 31, 1993) (Plunkett, J.); *United States ex rel. Yates v. Hardiman*, 727 F.Supp. 436, 439 (N.D.Ill. 1989) ("Petitioner's failure to object to the prosecutor's statements at trial precludes him from basing his habeas claims on these statements, absent a showing of cause and prejudice.").

### (ii) Attacks on Campos' Right to Testify

■ Campos further contends that the prosecutor made statements which amounted to attacks on Campos' decision to exercise his right to testify on his own behalf. By repeatedly commenting on the "irony" of the fact that, unlike the victim, who was forever silenced, Campos could take the stand and testify to his version of events, Campos maintains that the prosecutor "attacked" the defendant's exercise of his rights.[8] In support of this claim, Campos relies on *Cunningham v. Zant*, 928 F.2d 1006, 1019 (11th Cir.1991). In *Zant*, the prosecutor "wonder[ed]" to the jury, if a defendant who "takes his chances on killing a man, [and] robbing a man," was "really entitled to [his rights]," or whether he was simply "trifling with the processes of this court." *Id.* at 1019, n. 22 & 23. The *Zant* court found that, through his statements, the prosecutor had suggested that the petitioner was somehow not entitled to his Sixth Amendment rights.[9]

Unlike *Zant*, the prosecutor in this case did not accuse the petitioner of "trifling" with the judicial process, or of exercising rights to which he was not entitled. While it is hard to deny the emotional appeal of the prosecutor's statements, it does not amount to an attack on Campos' exercise of his constitutional rights. Instead, the commentary pre-

go because my family is going to go." "We're not going to go." "Fine. Monico, do what you want. Go with my father if you want. I'm going to the party with my family."

"Those may have been the very last words that Victoria Espinoza spoke in her very young life."

Transcript at p. 617.

Prosecutor: But we're not going to know, we're not ever going to know because she's not here to tell us that. She was taken away from us when the defendant fired the bullet into her brain that killed her and her unborn child. He gets to speak for her and say what her last words were. How ironic. He takes her away from us and yet when he wants to he can sum her up.

Well, someone has to speak for Victoria Espinoza. I'm an Assistant State's Attorney. I represent the people of the State of Illinois. You people, the Espinozas, and I can speak for Victoria Espinoza, and I must.

Transcript at pp. 617–18.

Prosecutor: I can't tell you what Vicki's last words were. But I think I can speak for her when I think about what a deliberate waste of

life this was, how it could have been avoided, completely averted. And I turn and I ask you, Monico, was it worth it?

Transcript at p. 637.

**8.** The prosecutor made the following statements:

And more unique than [the jury service experience] you've actually had a chance [to] listen to a murderer take the stand and testify and tell his version of events.

Transcript at p. 660.

Prosecutor: [A]fter 14 months he can say what he wants up there about that night.

Transcript at p. 669.

Prosecutor: [Campos] gets to speak for her and say what her last words were. How ironic. He takes her away from us and yet when he wants to he can sum her up.

Transcript at p. 617–18.

**9.** Because the court had already ruled that the trial court had given improper jury instructions, however, the *Zant* court did not determine whether the misconduct sufficed to warrant a new sentencing hearing.

sumes Campos' guilt, something a prosecuting attorney clearly can do, and accurately reflects the fact that the accused is the only person who can speak to what actually happened that New Year's Eve. Moreover, as we observed above, given the evidence presented at trial, we cannot conclude that the statements at issue affected the outcome of the trial. Thus, the prosecutor's alleged misconduct in closing argument does not warrant habeas relief.

### C. *Voir Dire*

Finally, Campos contends that his constitutional right to an impartial jury was violated when the court failed to ask a juror who appeared to be pregnant, whether she was, indeed, expecting a child. Campos' argument rests on the premise that a pregnant woman cannot be impartial when facing a defendant charged with killing his pregnant wife.

We observe at the outset that trial courts have broad discretion in structuring and conducting *voir dire, Mu'Min .v. Virginia,* — U.S. ——, ——, 111 S.Ct. 1899, 1904, 114 L.Ed.2d 493 (1991), and that *voir dire* need only provide "some basis for a reasonably knowledgeable exercise of the right of challenge whether for cause or peremptory." *United States v. Thompson,* 807 F.2d 585, 590 (7th Cir.1986). It is nonetheless true that where the circumstances of a given case present a particular threat to the impanelling of an impartial jury, due process may require a court to question veniremen regarding potential bias. *See Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976) ("In *Ham[ v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973) ], however, we recognized that some cases may present circumstances in which an impermissible threat to the fair trial guaranteed. by due process is posed by a trial court's refusal to question prospective jurors specifically about racial prejudice during *voir dire.*"). Therefore, in order to set forth a constitutional violation, Campos must demonstrate (1) that the circumstances of this case warrant questioning of potential jurors about prejudice relating to the nature of the crime, and (2) that the court failed to adequately question prospective jurors about such prejudice.

Even if Campos was able to demonstrate the former, he cannot establish the latter. Presumably, the juror's pregnancy is relevant only as it provides evidence of possible bias against a defendant accused of killing a pregnant woman. Importantly, the appellate court found that the juror in question was twice asked, and twice stated, that she did not believe that the taking of the life of an unborn child is a crime or wrong under all circumstances. *People v. Campos,* 592 N.E.2d at 93, 169 Ill.Dec. at 606. Additionally, she stated that she could follow the principles and instructions of the law, and that she could be fair and impartial to both sides. *Id.* Having been asked directly about any bias regarding the nature of the crime, and having unequivocally responded that she would follow the law without prejudice, we are at a loss to perceive how the court's failure to ask whether the juror was pregnant, a more indirect means of gleaning bias, violated Campos' right to impanel an impartial jury. Accordingly, petitioner's request for habeas relief on this ground must fail.

### III. Conclusion

For the foregoing reasons, we deny the petitioner's request for habeas corpus relief. It is so ordered.